EXCHANGE BANK OF MACON *v.* LOH, adm'r, *et al.*

1. A creditor has, for the purpose of indemnifying himself against loss, but for no other, an insurable interest in the life of his debtor.
2. This interest can not exceed in amount that of the indebtedness to be secured. Such indebtedness may, however, include the cost of taking out and keeping up the insurance, if made a charge against the debtor, or his estate, or upon the proceeds of the policy when collected.
3. Courts should not concern themselves with the disposition of the proceeds of "wagering" policies.
4. The evidence in the present case warranted a finding that the policy in question was not of this character, but that it was in good faith taken out by the insured himself and by him assigned to his creditor as collateral security merely; and the judgment rendered was not contrary to law. LITTLE, J., concurring specially.

Argued February 1, — Decided July 18, 1898.

Petition for direction, etc. Before Judge Felton. Bibb superior court. November term, 1896.

*Bacon, Miller & Brunson,* for plaintiff in error.

*Hardeman, Davis & Turner, Hill, Harris & Birch, Dessau, Bartlett & Ellis* et al., contra.

LUMPKIN, P. J. It is provided in section 2114 of our Civil Code that a policy of life-insurance may lawfully be taken out only upon the life "of the assured, or of another in whose continuance the assured has an interest." It is well settled that a creditor has an insurable interest in the life of his debtor, but the nature and extent of this interest has become a seriously complicated question. Much of the confusion now surrounding this subject is, we think, attributable to two erroneous views which have been entertained and announced by quite a number of the most respectable courts and judges in this country. The first is, that a contract effecting insurance upon the life of a debtor for the benefit of a creditor is not a contract of indemnity; and the second is, that the creditor's insurable interest in the debtor's life is not confined strictly to the amount of the indebtedness to be secured. Before proceeding further, it may be remarked that the form in which the transaction is clothed is utterly immaterial. It makes not a particle of difference whether the policy be payable to the insured, or his es-

tate, with an assignment to the creditor, or payable directly to the creditor as the nominated beneficiary. The real thing to be ascertained, in any given instance, is what was the actual object of the parties; for by this test alone is the legality of what they did to be determined.

1. Our first proposition is, that effecting insurance for the purpose of securing an indebtedness is a contract of indemnity, and nothing else. We have the utmost confidence in the correctness of this assertion. Indemnity is the only logical end to be attained by a transaction of this kind. What possible right has a creditor to be the beneficiary of such insurance except to protect himself against loss? and what is such protection, if not indemnity? Notwithstanding the fact that eminent jurists have held otherwise than as above laid down, we can not help thinking that this is a very plain proposition, and one as to which there ought to be no serious difference of opinion. We will cite a few of the great array of authorities which we could produce in support of our position, making, as we proceed, such comments as may seem appropriate.

In Godsall v. Boldero, 9 East, 72, we find the following: "A creditor may insure the life of his debtor to the extent of his debt; but such a contract is substantially a contract of indemnity against the loss of the debt." Lord Ellenborough said: "This assurance . . is in its nature a contract of indemnity, as distinguished from a contract by way of gaming or wagering;" and, in this connection, he quoted a pertinent extract from Lord Mansfield's opinion in Hamilton v. Mendes, 2 Burr. 1210. It is true that in the latter case Lord Mansfield was dealing with a case of marine insurance, and it is also true that the Godsall case was subsequently overruled; but it is apparent that Lord Ellenborough thought the doctrine of the marine-insurance case was applicable to the life-insurance case which he had under consideration, and in this view we concur. Whenever it is admitted that a contract of life-insurance made for the benefit of a creditor is not one having indemnity for its object, we necessarily stamp it as a purely wagering contract. There is much reason for the position that even ordinary contracts of life-insurance, whereby a man insures his own life for

the benefit of those dependent upon him, are contracts for in-
demnity merely; but we do not care to enter upon a discussion
of this question, or assail the great current of authority tend-
ing to establish the contrary; this being a matter not involved
in the case now before us.    Accordingly, we will adhere
strictly to our text, which is that life-insurance effected to se-
cure a debt is, and can be, for nothing else but indemnity
against loss.    A creditor secured by a policy of marine or fire
insurance can collect thereon, for his own benefit, so much only
as will save him from actual loss, the precise amount of which
is easy of ascertainment.    The interest of a creditor holding as
security a life policy can be as readily computed in dollars and
cents, being properly measured by the amount of the debt,
which, as we shall before concluding endeavor to show, con-
stitutes the sole basis of his insurable interest.    How, then, can
it be said that it would be against public policy to allow a cred-
itor to speculate upon the mere chance of property being de-
stroyed by the dangers of the sea or by fire, and not equally
repugnant to public policy for him to speculate upon the life
of a fellow-creature?    And if the creditor protected by the life
policy can lawfully stipulate for anything more than indemnity,
what prevents the transaction from being a speculation, pure
and simple?    We are at a loss to perceive any rational distinc-
tion between life and marine or fire insurance in so far as the
supposed right of a creditor to effect insurance beyond the ex-
tent of his insurable interest is concerned.    Surely, in view of
section 2117 of our Civil Code, which declares that the princi-
ples governing "fire-insurance, wherever applicable, are equally
the law of life-insurance," this court would not be justified in
giving recognition to any such intangible and specious dis-
tinction.

In Porter on Insurance (2d ed.), 13, it is said that a creditor
who insures his debtor's life "obtains a contract of indemnity
against the loss of his debt by the death of the debtor before it
has been paid"; and that, "In such a case, the debt is not the
mere excuse for the policy; but the securing of the debt, or in-
demnification against its possible loss, is the reason for the in-
surance being effected."    This author says that Lords Mansfield

and Ellenborough "both undoubtedly considered that insurance sur autre vie was a contract of indemnity," and that the case in 9 East was decided upon this view. He then refers to the fact that this case was overruled in Dalby v. India & London Life Co., 24 L. J. C. P. 2, 15 C. B. 365, and Law v. London Indisp. Co., 24 L. J. Ch. 196, 1 K. & J. 223, and asserts that the decision in the first of these two later cases was based upon a misinterpretation of the English "gambling act" and divers misconceptions of the real nature of a contract of life-insurance effected for securing a creditor. (See pages 14 and 15.) On page 17, he states that a policy of insurance taken out by a man on his own life has been settled not to be a contract of indemnity, "but to be a contract by the insurer to pay a certain sum on the happening of a given event—usually the death of the assured, or his attaining to a certain age—and the sum will not vary with reference to the greatness or smallness of the loss to the family of the assured." This alleged distinction between ordinary life-insurance which a man takes out for the benefit of his family, and that taken out for, or assigned to, a creditor for his protection, was recognized as correct by the Supreme Court of the United States in Central Bank of Washington v. Hume, 128 U. S. 195; but it was therein distinctly laid down that the latter was a contract of indemnity. Mr. Chief Justice Fuller said (page 205): "Marine and fire insurance is considered as strictly an indemnity; but while this is not so as to life-insurance, which is simply a contract, so far as the company is concerned, to pay a certain sum of money upon the occurrence of an event which is sure at some time to happen, in consideration of the payment of the premium as stipulated, nevertheless the contract is also a contract of indemnity. If the creditor insures the life of his debtor, he is thereby indemnified against the loss of his debt by the death of the debtor before payment." This high court had previously, in at least one case, recognized the correctness of the doctrine that life-insurance for a creditor's benefit was a contract for his indemnity. "In cases where the insurance is effected merely by way of indemnity, as where a creditor insures the life of his debtor for the purpose of securing his debt, the amount of insurable interest

is the amount of the debt." (Mr. Justice Bradley, in Conn. Mut. Life Ins. Co. *v.* Schaefer, 94 U. S. 461, 462.) An assignment of a life-insurance policy for the purpose of securing a creditor is "for his indemnity." 13 Am. & Eng. Enc. L. 648. "A creditor's claim upon the proceeds of insurance intended to secure the debt should go no further than indemnity, and all beyond the debt, premiums and expenses should go to the debtor and his representative, or remain with the company, according as the insurance is upon life or on property." 2 May, Ins. (3d ed.) § 459A.

In view of the foregoing authorities and of the sound sense and reason of the rule they lay down on this subject, it is difficult to understand how there can be any doubt that an insurance policy upon a debtor's life, held by a creditor as security for a debt, is simply and merely, so far as the latter is, concerned, a contract for indemnifying him against loss. To our minds, no other view of this matter can be accepted as sound. We could, as already intimated, produce many citations to the same effect as those appearing above; but we do not think this is necessary, for we are satisfied that if our first proposition really required demonstration, it stands proved.

2. A single step carries us easily and naturally to the next proposition we are to consider; which is, that the insurable interest which a creditor has in the life of his debtor can not exceed in amount that of the indebtedness to be secured. Before proceeding with this discussion, we will briefly explain the meaning of the word "indebtedness" as here used. We wish to be understood as employing it in a liberal sense, and, accordingly, as holding that it may embrace not only a debt, or debts, actually existing when the insurance is taken out by the debtor, or is thereafter assigned to the creditor, but also additional indebtedness to arise upon the making of further loans or advances by the creditor to the debtor—such, for instance, as cash for premiums to be paid in obtaining the policy or in keeping it alive. Manifestly, if expenses thus incurred by the creditor are made a charge against the debtor or his estate, the creditor may, by agreement, hold the policy as security therefor, and look to its proceeds for his reimbursement. The same is also

true if such expenses, though not made a debt generally against the debtor or his estate, are made a charge upon the money to be realized from the policy; for this, in effect, is making the cost of the insurance ultimately payable out of a fund which in law primarily belongs to the debtor's estate, subject to the creditor's right to so much thereof as he is entitled to receive upon his secured claim, or claims, against the deceased. A creditor can not, however, rightfully appropriate the proceeds of a policy held by him as a collateral security to the repayment to himself of sums voluntarily paid by him for premiums for which the debtor was in no way liable and which could not lawfully be made a demand against his estate or its assets. If a creditor desired protection by way of insurance upon his debtor's life, and chose to pay for it himself, this would be proper enough; but the insurance would be available to the creditor to no greater extent than the amount of his insurable interest at the time the insurance was effected, viz., the amount of the then-existing indebtedness.

We will now undertake to show that whenever it is attempted to give to a creditor any greater insurable interest in a debtor's life, the transaction becomes a wagering contract. If one can not for his own benefit insure a life in which he has no interest at all, why does not insurance for a creditor's benefit, when effected for anything beyond indemnity — the right to which gives the creditor his insurable interest — stand upon the same footing? Whenever a creditor undertakes to stipulate for more than the amount of his just demands, what distinguishes the transaction from a wagering contract, pure and simple, having for its object speculative gain? If he can lawfully take one dollar more than the amount of his debt, why can he not take any number of dollars within the limits of the policy? Where, and upon what principle, is the line to be drawn? An examination of scores of cases bearing upon every conceivable phase of these questions has satisfied us that it has become a difficult, if not an impossible, task to make the daylight of truth shine so clearly upon the complicated and conflicting mass of decisions as to bring into clear view the correct rule relating to this class of insurance. A hurried examination of the cases cited

in this opinion would disclose that the courts of this country have indulged in quite a variety of holdings thereon. An exhaustive list of all the cases touching upon the subject, with even a brief comment upon each, would unduly expand this opinion, if indeed it did not make it fill a volume of our reports. The language quoted supra from the opinion of Mr. Justice Bradley in the case cited from 94 U. S. shows that he thought the amount of the creditor's insurable interest was to be measured by the amount of the debt. In Roller *v.* Moore's adm'r, 86 Va. 517, 518, Lacy, J., said: "To the extent in which the assignee stipulates for the proceeds of the policy beyond the sums advanced by him, he stands in the position of one holding a wager policy." The Supreme Court of Tennessee, in Rison *v.* Wilkerson & Co., 3 Sneed, 565, held that a creditor to whom had been assigned a policy issued to his debtor could retain of its proceeds no more than the amount of the original debt and certain premiums paid by the creditor to keep the policy alive. Coon *v.* Swan, 30 Vt. 6, is a case supporting the doctrine that a creditor can not lawfully keep any more of the proceeds of a policy insuring a debtor's life and collected by the former than the amount actually due by the debtor, although the policy was payable to the creditor and the contract between the parties undoubtedly contemplated that the creditor might make a profit by the transaction. In Cheeves *v.* Anders, 87 Tex. 287, it was held that: "The limit of interest of a creditor in a policy upon the life of his debtor is the amount of such debt and interest, plus amount expended to preserve the policy, with interest thereon." The following are extracts from 13 Am. & Eng. Enc. L.: "Where the assignment is for the purpose of securing a creditor, although he is entitled to recover the face of the policy, he can not hold what is not necessary for his indemnity. The legal representatives of the debtor will be entitled to the balance." Page 648. "Where insurance is effected on the life of a debtor in favor of a creditor, whether by the debtor himself or the creditor, and whether the premiums are paid by the debtor or the creditor, the latter, on the death of the former, is entitled to the amount of his debt and premiums, and the representatives of the debtor to the balance of the proceeds of

the policy." Page 653. Bacon, in his work on Benefit Societies and Life Insurance (vol. 1, § 250a, 2d ed.), says: "A creditor has an insurable interest in the life of his debtor, and can insure the life of the debtor without his consent, but such interest is limited to the amount of the debt." And see, in this connection, 2 May on Insurance, 3d ed., § 459A., cited supra.

Giving to the word "indebtedness" the comprehensiveness above indicated, the following cases all to some extent sustain the rule for which we are contending, that the creditor's insurable interest in the debtor's life can not exceed the amount of the secured indebtedness: Am. L. & H. Ins. Co. v. Robertshaw, 26 Penn. St. 189; Downey v. Hoffer, 110 Penn. St. 109; Ruth v. Katterman, 112 Penn. St. 251; Seigrist v. Schmoltz, 113 Penn. St. 326; Schonfield v. Turner, 75 Tex. 324; Eq. Life Ins. Co. v. Hazlewood, Id. 338; Cawthon v. Perry, 76 Tex. 383; Lewy & Co. v. Gilliard, Id. 400; Goldbaum v. Blum, 79 Tex. 638; Helmetag's adm'r v. Miller, 76 Ala. 183; Met. Life Ins. Co. v. O'Brien, 92 Mich. 584; Cammack v. Lewis, 15 Wall. 643; Page v. Burnstine, 102 U. S. 664; Warnock v. Davis, 104 U. S. 775. We do not, however, wish to be understood as asserting that these cases are closely in point or as concurring in all of the rulings therein made — certainly not in those whereby the courts undertook the distribution of funds arising from the collection of wagering policies. It is not essential to our present purpose to analyze these cases, discuss the various questions dealt with therein, or point out specifically the conclusions to which we do not assent. Without undertaking to do this, we simply cite them as containing decisions and dicta which, to a greater or less extent, recognize the correctness of our present contention. In the highest courts of at least two States, Maryland and Pennsylvania, efforts have been made to establish the proposition that a creditor may lawfully have insurance upon the life of his debtor in an amount greater than that of the debt secured, provided there is not a "gross disproportion" between these two amounts. The case of Rittler v. Smith, 70 Md. 261, was a suit by the administratrix of the insured to recover of a creditor the excess remaining in his hands after satisfying all his demands against the insured. It appears that

the creditor, of his own motion, insured the life of his debtor and paid all premiums. The debt was $1,000; the policies on their face amounted to $6,500, but owing to certain stipulations therein, only $2,124.82 were collected. The surplus amounted to $474.53. The policies were issued in the name of the creditor, and, so far as appears, there was no understanding, express or implied, between him and his debtor that the latter was, in any event, to have any interest in the policies or their proceeds. The court held that the creditor was entitled to the surplus. The decision was based on the ground that the creditor had a right to procure a policy on the life of his debtor, provided there was not "such a gross disproportion between the debt and the amount of the policy as to stamp the transaction with want of good faith and as a mere speculation or wager," and that accordingly, the entire proceeds of the policy belonged to the creditor. Such a "rule" would seem entirely too loose, and itself too "speculative," to admit of anything like a reasonable and practical application, even if it is to be considered as resting upon sound doctrine rather than as repugnant to the spirit, if not directly opposed to the letter, of the law in regard to wagering contracts.

The Supreme Court of Pennsylvania, in the case of Cooper *v.* Shaeffer, 11 Atl. Rep. 548, held that "where the disproportion between the amount of a policy taken out by a creditor on the life of his debtor and the debt thereby secured is very great, as where the insurance is $3,000 and the debt $100, it is the duty of the court to declare the transaction a wager, as matter of law." This case does not appear in the Pennsylvania State Reports. In the opinion, Sterrett, J., characterizes as "a just and practicable rule" a suggestion which Paxson, J., speaking for himself, had made in Grant's adm'r *v.* Kline, 115 Penn. St. 618, to the effect that a policy taken out by a creditor on the life of his debtor ought to be limited to the amount of the debt with interest, and the amount of premiums with interest thereon, during the expectancy of the life of the insured, according to the Carlisle tables. In the subsequent case of Ulrich *v.* Reinoehl, 143 Penn. St. 238, a policy for $3,000 was assigned to a creditor, absolutely, to secure a debt of $110.02. The

creditor at the trial offered evidence to show the expectancy of the deceased according to the Carlisle tables, and expert testimony going to prove that, had deceased lived up to such expectancy, the total amount invested in the policy would have been $4,336.31. In the opinion which was delivered by the learned jurist last mentioned, he having in the meantime become Chief Justice, he undertakes to prove the correctness of the above-mentioned "rule," it being thus stated: "A creditor may lawfully take out a policy of insurance on the life of his debtor in an amount sufficient to cover the debt, with interest, and the cost of such insurance with interest thereon, during the period of the debtor's expectancy of life according to the Carlisle tables; but if such amount be exceeded, the policy may be a wagering transaction." The substance of the argument embodied in the opinion is, that if the principal and interest of the debt secured, the aggregate sum of the premiums which would have to be paid during the entire period of the expectancy of the insured in case he lived out the same, and the interest on such premiums, would all together amount to a sum greater than the face of the policy, it would not be a wagering contract; but would be one if the chances were that the insured would not live out his expectancy and there would be a consequent probability that the proceeds of the policy would exceed a sum representing the total cost of the policy and the amount of the debt. Among other things urged in support of the views above outlined, Chief Justice Paxson says: "It seems clear upon reason that the creditor may take out a policy in excess of his debt. But to what excess? The answer to this question obviously depends upon circumstances. An important element in the consideration of this question is the age of the assured. The difference between a policy on the life of a man twenty-five years of age and one of seventy-five, is clear to the dullest understanding. The assured was only forty-two years of age, and his expectancy of life was twenty-six years. The chances were greatly in favor of his living out his expectancy. The Carlisle tables were prepared with care by competent experts, and are the result of actual experience. I am therefore justified in saying that the chances were in favor of the assured liv-

ing out his expectancy, in which case there would be the loss of interest on the debt for twenty-six years, added to the dues and assessments with interest thereon for the same period. The evidence shows that, in such event, the defendants would have been losers by a considerable sum. In fact, I infer from the tables furnished that after about seventeen years the defendants would have carried this policy at a loss. The defendants assumed this risk when they took out the policy. They also had the chance of the assured not living out his expectancy. This is a risk which an insurance company assumes upon every policy which it issues. In a particular instance, the assured may live many years beyond his expectancy, which is a large gain to the company. But this gain is equalized by the loss in instances where the assured dies before the expiration of his expectancy, so that in the vast volume of business of such corporations the average result is reasonably uniform. But the holder of a single policy can have no average result. He takes the risks with the chances fairly balanced."

With the utmost respect, we think this is fallacious reasoning. As stated by the distinguished Chief Justice, "All life-insurance is in one sense speculative," and this remark applies to every policy. It is radically erroneous to say that one average man has a greater or a less chance to live out his expectancy than another. The man of forty-two is no more apt to live out his expectancy of twenty-six years than the man of seventy-five is to live out his expectancy of seven years. Life-insurance premiums are fixed relatively to the different ages and expectancies of the persons insured, and every company whose business is conducted on sound principles proceeds upon the theory that it must be the gainer in every risk where the insured lives out his expectancy and all the premiums are paid. Some live longer and others shorter periods, but the company looks to the average, and on the average basis it must take in more than it pays out, or else ultimately fail. Clearly, therefore, in every instance of life-insurance there is a chance for the insured, or the person paying the premiums, to pay in more than the policy will bring back; and as a consequence, there can, under the doctrine announced in Pennsylvania, be no such

thing as a wagering policy. The test that the amount of a policy taken out to secure a debt must not be out of proportion to the amount of the debt with added premiums and interest thereon will not stand scrutiny, for every one carrying the burden of keeping up a life policy may, whether a debt be thereby secured or not, suffer loss by paying out more than is finally received on the policy. · In the case of a man who insured his life for the benefit of his wife and paid out in premiums more than the insurance company paid to her after his death, the loss would be the difference between the sum of the premiums with interest and the proceeds of the policy. If a creditor who held as collateral security a policy of life-insurance, and paid the premiums under a contract with the debtor to be reimbursed therefor out of the fund to be realized by the payment of the policy, paid to the company more than it returned when the debtor died (which would ·inevitably be the case in the event the latter lived out his expectancy and all premiums up to that time were duly met), this creditor, if the collateral was the only source to which he could look for satisfaction, would lose the difference between the amount received on the policy and the amount resulting from adding the sums representing the premiums, the interest thereon, *and the debt;* and this would be true whether the debt was great or small. If, for instance, one man loaned to another $10 and insured the latter's life in the sum of $50,000 to secure the debt, the creditor undertaking to pay the premiums, and the debtor (whether young or old) lived out his expectancy and died leaving no assets but the insurance money, the creditor would certainly lose the difference between the face of the policy and the sum of the premiums and the interest thereon, and would lose also the $10 and the interest on that sum. If the debt thus created was $25,000, the creditor's loss would, in that case, be greater by $24,990 and interest than in the other. There would be no difference in principle between the two cases. It is therefore to be regretted that the Pennsylvania court, while declaring that there should be "a fixed rule" for determining when a creditor was, and when he was not, obtaining an "excess of insurance," did not succeed in evolving a more satisfactory one. The truth is, there can

be no sound rule on the subject which does not recognize the truth of the proposition, that whenever a creditor stipulates for receiving more than indemnity upon a policy insuring his debtor's life, he is engaged in a speculative venture, the gain from which, if successful, would be represented by the excess of the sum derived from the policy over the amount of the "indebtedness" thereby secured.

Enough has been said to make it clear that, with our views of the question under discussion, we can not follow as sound the decision rendered by the Supreme Court of Indiana in Amick *v.* Butler, 111 Ind. 578, which was strongly relied on by the able counsel for the plaintiff in error. In that case the facts were as follows: "Frazee was indebted to Amick in the sum of about six hundred dollars." It was agreed between them that the creditor should take out a policy for $2,000 in an assessment benefit association upon the life of the debtor, paying all expenses and premiums. This was done, the policy as issued naming the creditor, his heirs and assigns, as beneficiaries. "At the time the policy was issued, it was orally agreed that if Frazee should at any time thereafter pay his indebtedness and reimburse Amick for the cost of obtaining the policy and carrying the insurance, the latter would turn over the policy to the former." It did not appear, however, that there was any express understanding between them as to the disposition of the surplus (if any) after the death of the insured, in the event he had not paid off such demands. The creditor having collected the entire sum due upon the policy upon the death of his debtor, the latter's administrator brought an action to recover the surplus, which amounted to "twelve hundred and fifty-nine dollars and fifty-eight cents." The court took the position that no intention to enter into a wagering contract was shown; that the policy belonged absolutely to the creditor, the stipulation as to paying off the debt not having been complied with by the debtor prior to his death; and therefore, no part of the proceeds thereof could be claimed by the administrator upon the theory that the creditor held the same as trustee. It would seem that without any great strain the court might have construed the contract to be for indemnity merely; for it

was not necessary that there should be any express stipulation as to the distribution of the proceeds. On the contrary, nothing as to this having been specifically agreed to, the law would raise a constructive trust, rather than treat the contract as a wager. That, as construed by the court, it was a wager, pure and simple, seems evident. By the early death of the debtor, the creditor won a clean stake of over $1,250; whereas, had the debtor continued to live insolvent to a ripe old age, the creditor would doubtless have lost a part or the whole of his entire debt, because forced to abandon his policy or pay in assessments and premiums an amount equal to the whole face of the policy, which was only $2,000, and consequently could not, according to the rule as to "gross disproportion," be considered as evidencing an attempt and intent to gamble. For a just criticism on this decision, see again 2 May, Ins. § 459A, p. 1055.

3. As already intimated, there are numerous cases in which the courts have dealt with life-insurance policies as valid which ought, in our judgment, to have been treated as mere nullities. Some of these cases were actions against insurance companies upon what we regard as wagering policies, and others of them involved controversies over the proceeds of such policies which the insurance companies had voluntarily paid. No argument is required to show that, in cases of either character, the courts ought not to afford any relief whatever, but should in every instance leave the parties exactly as they were before the litigation began. No court can properly concern itself with the enforcement of a contract which is contrary to public policy and for that reason void, nor with the adjustment of alleged rights or equities growing out of such a contract. This doctrine is so thoroughly established and so universally recognized that it will not, we apprehend, be questioned; but it has evidently been too often overlooked by the courts in their efforts to do what they conceived to be "justice." Our Civil Code (§ 3668) declares that "A contract which is against the policy of the law can not be enforced," and that "wagering contracts" are of this character. Whenever, therefore, it appears that a particular contract of life-insurance falls within the prohibited class, no court of this State should have anything to do either with its enforcement or the distribution of its proceeds.

4. We will now apply the foregoing to the facts of the present case, a fair and accurate statement of which we find in the brief of counsel for the plaintiff in error, as follows: "John D. Hudgins was a merchant, residing in Macon, who had been carrying on there for many years a wholesale and retail liquor business. The Exchange Bank, plaintiff in error, had advanced to him, at various times, large sums of money. In December, 1892, this indebtedness amounted to something over ten thousand ($10,000.00) dollars, for which the bank held Hudgins's notes. To secure the payment of this indebtedness Hudgins had given to the bank certain mortgages on both his real and personal property, including his stock of liquors. To further secure the bank he had also taken out a policy of insurance on his life for one thousand ($1,000.00) dollars in the Manhattan Life Insurance Company and a policy for five thousand dollars in the New York Life Insurance Company; both of which policies were duly assigned by him to the bank, and upon both of these policies Hudgins himself paid the premiums. These policies were recognized by both parties as being the property of Hudgins, transferred by him to the bank as collateral security for his indebtedness.

"In the latter part of 1892 Hudgins applied to one Winship, who was the general agent in Georgia for the Equitable Life Insurance Company of New York, for a policy of five thousand ($5,000.00) dollars. His application was duly forwarded to the home office, and upon the request or instruction of Winship, and without the request or even the knowledge of Hudgins, the company sent out to Winship two policies of five thousand ($5,000.00) dollars each, on Hudgins's life. Upon the reception of the policies Winship endeavored to persuade Hudgins to take them both. Hudgins, however, would only accept the one for five thousand ($5,000.00) dollars, for which he had applied, and declined to take or accept the second or additional policy for five thousand ($5,000.00) dollars, and refused to pay the premiums due thereon, saying that the rate was so high he was not able to carry it. Upon this, Winship, knowing that Hudgins was indebted to the Exchange Bank, carried the second policy to J. W. Cabaniss, the cashier of the bank, stated to him

the facts, and requested him to take the policy for the bank as a creditor of Hudgins, and pay the premiums thereon. This Cabaniss finally consented to do, provided Hudgins would execute the necessary assignment. This was done by Hudgins, Winship delivering the policy to the bank and receiving from the bank the premium due thereon. Cabaniss had no conference or consultation with Hudgins about the transaction, either personally, by letter, or by messenger, and it was distinctly understood between Cabaniss, representing the bank, and Winship representing the Equitable Life Insurance Company, that the policy was taken out by the bank for its own protection as a creditor of Hudgins, and that in no event was Hudgins to be liable for that premium or any future premiums either to the bank or to the insurance company. The demands for the subsequent premiums were made by the insurance company directly on the bank and not against Hudgins, and they were paid by the bank and were not charged against Hudgins upon the books of the bank, nor has any claim or demand ever been made by the bank for the payment of such premiums, either against Hudgins in his lifetime or against his estate.

"On the 12th day of March, 1894, Hudgins died intestate, and Edward Loh was appointed his administrator. Upon examination by the administrator, Hudgins's estate was found to be hopelessly insolvent, and on August 3d, 1895, the administrator filed his equitable petition in Bibb superior court against the Exchange Bank and the various other creditors of Hudgins, to marshal the assets of the estate and to obtain the direction of the court as to the administration of the same. To this petition the Exchange Bank duly filed its answer, setting up the facts recited above. The case came on for trial on March 22d, 1897, and by consent of all parties was heard by the presiding judge without the intervention of a jury. Upon the trial it appeared from the evidence that the debt of the Exchange Bank at that time amounted, principal and interest, to twelve thousand, two hundred and twenty-eight dollars and ninety-four cents ($12,228.94). It was also shown that the proceeds of the policies collected by the bank from the New York Life and the Manhattan companies, with interest thereon to the date of

the trial, from the date of collection, amounted to seven thousand and thirty-two dollars and two cents ($7,032,02), which left a balance due to the bank upon its claim, of five thousand, one hundred and ninety-six dollars and ninety-two cents ($5,196.92). Upon this balance of five thousand, one hundred and ninety-six dollars and ninety-two cents ($5,196.92) the bank proposed to credit the net proceeds of the fund arising from the sale of the real and personal property upon which it was admitted by all parties that the bank held the highest and best lien, and which fund amounted to four thousand, five hundred and thirty-seven dollars and seventy-eight cents ($4,537.78). This would have left a balance still due to the bank from the Hudgins estate of six hundred and fifty-eight dollars and seventy-four cents ($658.74), upon which final balance the bank proposed to credit a sufficiency of the net proceeds derived from the Equitable insurance policy to pay the same, and that it should retain as its own property the entire balance of the fund derived from such policy in the Equitable company.

"The court refused, however, to allow the Exchange Bank to apply upon its claim any portion of the fund derived from the sale of the mortgaged properties, until the bank had first applied as a credit upon its claim the entire proceeds of the fund derived from the Equitable policy, the court finding in its decree that after making such credit of the Equitable fund the estate would *still* be indebted to the Exchange Bank two hundred and eighty dollars and forty-six cents ($280.46), which the court decreed to be the highest and best lien, to that extent and no more, upon the fund of four thousand, five hundred and thirty-seven dollars and seventy-eight cents ($4,537.78) derived from the sale of the mortgaged properties. To be entirely clear, the exact ruling of the court on this point is given in the following language quoted verbatim from the decree: 'The court holding, finding and decreeing that the proceeds of such Equitable insurance policy, after first reimbursing the bank for the premiums paid by it, with interest thereon, is the property of said intestate Hudgins, and not the property of said Exchange Bank, and must therefore be credited upon the bank claim as above directed.'"

It is only necessary to add that the insurance policy in question was payable to the estate of Hudgins, and that Cabaniss, the cashier, testified as follows: "What induced me to take out this third policy was the fact that the bank was practically carrying Mr. Hudgins's business, and had been for two or three years, probably longer, and his business had been getting worse, and I wanted all the protection that I could get in the carrying of his business, and I took this as additional protection." In answer to the question, "To what extent were you influenced in the taking out of that policy as an investment?" he said: "I regarded it as a good investment. He was quite an old man, and in the ordinary course of life he would probably not live very long, and I thought even as an investment it would do to take." From the foregoing it appears that there can be no dispute as to the following facts: (1) Hudgins was largely indebted to the bank, and, prior to the issuing of this policy, had assigned to it as collateral security for his indebtedness two other policies. (2) After this policy had been issued, he refused to accept it, when first tendered to him by the agent of the company. (3) Subsequently he did accept it, for he could not have assigned it to the bank without so doing. (4) He made an absolute assignment of the policy to the bank. (5) The bank paid the first premium and took the policy for its protection as a creditor of Hudgins, the cashier also having in mind at the time that the policy was a good investment. (6) The bank paid all the premiums which accrued upon the policy before the death of Hudgins. They were not charged to him upon its books, nor was any demand ever made upon him or his estate for the payment of these premiums.

If the assignment of the policy was made and accepted simply to place the bank in the same attitude as it would have occupied had it, upon its own responsibility, at its own expense and for its own benefit, applied for and obtained a policy upon the life of Hudgins, payable to itself and in which neither he nor his estate was to have any interest or concern, it was a wagering contract. But if Hudgins assigned the policy to the bank and it accepted the same as a collateral security for his existing indebtedness and for the further purpose of securing the repay-

ment to the bank out of the proceeds of the policy of all sums advanced for premiums, the transaction was a lawful and proper one. The form in which the transaction was clothed is, as above stated, immaterial, the question at last being: what was the real intent and purpose of the parties? This case belongs to one or the other of the two classes just indicated. If to the former, the judgment under review was wrong for two reasons: (1) the estate of Hudgins had no interest in the proceeds of the disputed policy, because there was no privity of contract between him and the insurance company, or between him and the bank; and (2) the court should not have undertaken to dispose of or distribute the proceeds of a wagering, or gaming, contract. If, on the other hand, this case falls within the latter class, the judgment excepted to should be sustained. In view of the facts as stated, did the evidence warrant the judge in finding that the transaction was lawful and valid? Or, to put the question in different form, did the evidence demand a finding that it was a wagering contract? The policy, being payable to the estate of Hudgins, purported to evidence a contract of insurance between himself and the insurance company, and the assignment of this policy to his creditor, the bank, could certainly have been made for a legitimate purpose. The writings, therefore, on their face, are perfectly consistent with the idea that the transaction which the parties had in mind was a lawful one, and the presumption of law would be that such was the fact. Does the parol evidence sustain or overcome this presumption? So far as relates to Hudgins, it is easy to conclude that he simply intended to supplement the security of like kind which he had already given to the bank, and that, being unable himself to pay the premiums, he was willing for the bank to do so and get its reimbursement out of the proceeds of the policy. There is nothing in the testimony which expressly negatives such a purpose on the part of Hudgins, and there are many circumstances from which its existence may be inferred.

The next inquiry is, what was the bank's purpose in taking the assigned policy? Mr. Cabaniss explicitly testified that he was seeking to obtain "additional protection"—that is, se-

curity; and though he did regard the policy somewhat in the light of an investment, his testimony did not require a finding that he deliberately sought to have the contract so disguised that it would not upon its face show what was the real truth of the matter, or that his purpose was to evade the law against gaming by any concealment or artifice.  On the contrary, it would seem that he accepted the assignment of the policy for no improper purpose, but may have been mistaken as to what legal rights would thereby be secured to the bank.  Neither any private understanding between the insurance agent and the cashier, nor the latter's opinion (if he entertained it) that the proceeds of the policy would belong exclusively to the bank, could affect Hudgins or his estate.  A secret purpose entertained by one party to a contract, but not disclosed to the other, does not bind the latter; for, obviously, as to this particular matter there was no "meeting of minds."  *Harris & Mitchell* v. *Amoskeag Lumber Co.*, 97 *Ga.* 465 (2), 469–470, and authorities cited.  It was certainly not shown that Hudgins made any agreement with the bank that he would claim no interest in the policy.  Nor can it be said that by mere silence he assented that the assignment should vest an absolute and unconditional ownership of the policy in the bank; for it nowhere appears that any such idea on the part of the bank's representative was communicated to Hudgins, or that he had any direct dealings with the bank in regard to this particular insurance.  If his purpose was that which we have attempted to show could, under the evidence, be attributed to him, viz. to give additional collateral security to the bank, it is very reasonable to conclude that he might have understood that the cashier's purpose, in procuring him to accept the last policy and assign the same to the bank, was simply to increase its security by taking and holding this policy in the same way it did the others, the bank being willing to advance the premiums and look for reimbursement solely to the proceeds of the policy, since he was unable himself to carry it.  At any rate, the trial judge was warranted in reaching the conclusion that these parties did not enter into a scheme to furnish a cloak to a purely colorable transaction; and it follows that the rights of the parties are to be measured

according to the terms of the contract as written, which evidences what purports to be a bona fide and entirely lawful transaction. Thus treated, the policy is without taint of illegality, and it was proper to limit the assignment to the object really intended to be thereby accomplished.

In this immediate connection, the case of Morland *v.* Isaac, 20 Beav. 389, is quite pertinent. In that case it appeared that Isaac, a tradesman, insured the life of his debtor, Walker, the policy being payable to the former. He charged the premiums to Walker, but the latter never paid them, nor does it appear that he ever expressly agreed to do so. Upon his death, the court held "that his representatives were entitled to the produce of the policy after payment of the debt and premiums." Isaac himself "denied that any express agreement had ever been made between him and Walker, either as to the amount to be insured (which was to be entirely at [Isaac's] discretion), or the ownership of the policy, or payment of the premiums; but it was clearly understood by [Isaac], and, he believed, also by Walker, that the policy was [Isaac's], and with respect to the payment of the premiums, that it should, in the first instance, be made by [Isaac], and it was fully understood that the moneys assured by the policy should remain [Isaac's] own absolute property." His "understanding and intention was, as he alleged, that if Walker should, in his lifetime, pay off the debt and premiums and expenses of insurance, he should be at liberty to do so, and in that case [Isaac] would either have dropped the insurance or transferred the policy to Walker." Isaac also stated that an entry of a charge in his account against Walker "for insurance was a mistake." The Master of the Rolls, taking into consideration the foregoing and also the facts that Walker knew the insurance was to be effected, that he had attended the insurance office for this purpose, and that when Isaac's account with the item for insurance charged therein was delivered to him he did not complain, was of the opinion that though Walker had never in express terms agreed to pay or become liable for the premiums, nor admitted liability therefor, the circumstances warranted the inference that he was so liable. Observed the Master, "This matter depends on the con-

tract between the parties. This, however, may either be expressed in writing or by parol, or it may be inferred from the acts and dealings between the parties from which a contract between them may appear." It was accordingly held that the policy was simply a security for the debt and the premiums, and that the creditor was entitled to payment of these and no more. It will be seen that this case in many respects resembles the one at bar, and is direct authority for the correctness of Judge Felton's judgment, if, as we think is true, he was warranted in finding as matter of fact that Hudgins, in assigning to the bank the policy in controversy, really intended merely to secure his existing indebtedness and the premiums to be paid on the policy, expecting his estate to get the benefit of the surplus, if any. If this was what he intended, and the bank took the policy for the purpose of securing these claims, the mere opinion of its cashier (like that of Isaac in the case supra), that it would absolutely own the policy and its proceeds, would not alter the legal status of the matter.

As somewhat applicable to this branch of the discussion, we again refer to Helmetag's adm'r v. Miller, 76 Ala. 183, and Roller v. Moore's adm'r, 86 Va. 512, cited supra. The following is extracted from the synopsis of the points decided in the latter case: "Assured made assignee an assignment absolute on its face of a policy of insurance on his life. The evidence, however, showed that in former transactions about the same matter the policy was held by assignee as security for advancements made by him for premiums and assessments on the policy: held, the assignment was not a new contract between the parties and an absolute assignment, but it bore the impress of the original transactions, and stood merely as a security for the advances made by assignee." In our case, the previous dealings between Hudgins and the bank, in the course of which he had assigned to it policies of insurance as collateral security for his indebtedness to it, greatly strengthens the conclusion that he intended no more at the time of the last transaction, but that, being unable to pay the premium upon the policy then assigned, he expected the bank to advance the necessary amount and look for reimbursement to the proceeds of this

policy when collected.   As all inferences in favor of the legality of a transaction are to be indulged, and as the conclusions of the judge below are sufficiently supported by evidence, the judgment rendered by him should be allowed to stand, especially as it is in direct accord with the justice and the equity of the case.

*Judgment affirmed.    All concurring, Little, J., specially.*

[NOTE.—In addition to the authorities cited in the foregoing opinion, see the following, which are more or less in point on the several questions discussed:   Gilman *v.* Curtis, 66 Cal. 116; Curtiss *v.* Ætna Life Ins. Co., 90 Id. 245; Franklin Life Ins. Co. *v.* Hazzard, 41 Ind. 116; Hight *v.* Taylor, 97 Id. 392; Walker *v.* Larkin, 127 Id. 100; Missouri Valley Life Ins. Co. *v.* Sturges, 18 Kan. 93; Tateum *v.* Ross, 150 Mass. 440; Ferguson *v.* Mass. Mut'l Life Ins. Co., 32 Hun, 306; Rawls *v.* Am. Mut. Life Ins. Co., 27 N. Y. 282; Matthews *v.* Sheehan, 69 Id. 585; Olmstead *v.* Keyes, 85 Id. 593; Wright *v.* Mut. Benefit Life Assn., 118 Id. 237; Gilbert *v.* Moose's adm'rs, 104 Pa. St. 74; Scott *v.* Dickson, 108 Id. 6; Clark *v.* Allen, 11 R. I. 439; Rivers *v.* Gregg, Hayden & Co., 5 Rich. Eq. (S. C.) 274; Price *v.* Knights of Honor, 68 Tex. 361; Pacific Mut. Life Ins. Co. *v.* Williams, 79 Id. 633; Crotty *v.* Union Mut. Life Ins. Co., 144 U. S. 621; 35 Am. Law Reg. 65–87, 161–183, and cases cited.]

LITTLE, J., concurring specially.   I agree to the judgment of the court as being sound and properly interpreting the rights of the parties; but I arrive at this conclusion for reasons different from those stated in the very able opinion rendered by Presiding Justice Lumpkin.   It is not my purpose to enter into a discussion of the case.   It has, from time to time, been considered by each of us with a great deal of care, and the authorities, which are numerous and conflicting, have been carefully examined.   It will be seen, by reference to the opinion of the majority of the court, that there are two propositions of law which form the basis for the conclusions reached.   The first is, that a contract effecting assurance upon the life of a debtor for the benefit of a creditor is a contract of indemnity.   The second is, that the creditor's insurable interest in the debtor's life is confined to the amount of the indebtedness to be secured.   I think that neither of these is a correct conclusion of law.

Neither of these questions, in my judgment, properly arises under the circumstances of the case; but meeting the proposition so broadly laid down, that insurance (life) for the purpose of securing an indebtedness is a contract of indemnity and nothing else, I have this to say:  By our Civil Code, § 2089, a contract of fire-insurance is clearly made a contract of indemnity. And by section 2120 of our Civil Code a contract of marine insurance is in terms classed as a contract of indemnity.  The definition of the contract of life-insurance which is made by the Civil Code, § 2114, is that it is a contract by which the insurer for a stipulated sum engages to pay a certain amount of money if another dies within the time limited by the policy.  If such contracts derive any of the incidents which attach to contracts of indemnity, they must arise under principles of law which are not enunciated in our code.  It is true that section 2117 of the Civil Code declares that the principles stated in the code in relation to fire-insurance apply equally to the law of life-insurance.  Manifestly, however, reference is had to those legal principles which pertain generally to fire-insurance, which can be made applicable to a contract of life-insurance; and this provision in no way affects the definition or meaning of these two contracts.  It is provided in the Civil Code, § 2114, in reference to contracts of life-insurance, that the assured must have an interest in the continuation of the life insured, and, both by text-writers and adjudicated cases, creditors have an insurable interest in the life of a debtor.

Mr. Joyce in his work on Insurance, vol. 1, 26, says that "although the question of indemnity as related to life-insurance has been prolific of much discussion by both text-writers and the courts, yet the weight of authority is that life-insurance is not a contract of indemnity."  And this author then proceeds to discuss the question, referring to a large number of adjudicated cases to support the text.  As a matter of law numerous courts have held them to be contracts of this character, while a great many other courts of final resort have held the contrary of the proposition; and it seems to me that the latter are more in accordance with principle.  A life is not, and can not of itself be, a subject of valuation.  Mr. Bunyon in his work on

Life Insurance, page 7, says that such insurances are independent of the value of the subject-matter; and in the case of the Conn. Mut. Life Ins. Co. *v.* Schaefer, 94 U. S. 457, it is declared that "in life-insurance the loss can seldom be measured by pecuniary valuations." The doctrine of indemnity contemplates that the insured shall be indemnified but shall never be more than fully indemnified for a loss. For instance, the contract of fire-insurance only indemnifies the assured against any loss which he may sustain within an amount named by the policy. This affects property. The value of the property destroyed can be ascertained, and the contract is a pure and simple indemnification for the value of the property destroyed. The same applies to a·contract of marine insurance. Property is there also the subject-matter of the contract; and hence our code treats these two contracts as contracts of indemnity. But a life is not property. It can not be valued so as to afford indemnity. The following authorities collected by Mr. Joyce rule that a contract of life-insurance is not a contract of indemnity. 15 Com. B. 365; 9 Ind. App. 139; 1 Kay & J. 228; 15 Md. 297; 24 N. J. L. 585; 29 N. Y. 282; 32 Hun, 311; 102 N. Y. 647; 9 R. I. 346; 108 Pa. St. 6; 138 Mass. 27; 35 Md. 188. For the doctrine that such contracts are not strictly contracts of indemnity, yet are in the nature of indemnity where a creditor insures his debtor's life, the author refers to Bacon's Benefit Societies & Life Insurance, § 163; 2 E. D. Smith, 294. That they are not contracts of indemnity such as fire and marine insurance contracts, he refers to 13 Wallace, 616.

As to the second proposition, the majority of the court rules that while a creditor, for the purpose of indemnifying himself against loss, has an insurable interest in the life of his debtor, this interest can not exceed in amount that of the indebtedness to be insured against, although it may include the cost of taking out and keeping up the insurance. While I do not dissent from this ruling, the conclusion of the court in my opinion is put upon a wrong doctrine, which very many of the cases cited by Presiding Justice Lumpkin will prove. A creditor has an insurable interest in the life of his debtor, and the amount of the debt and the expense of taking out and keeping

up the insurance must be the basis of the insurance; yet it is neither practicable nor essential to the validity of such a contract that the amount insured must exactly equal these sums. Indeed it is impossible that it can be so. If one owes another one thousand dollars, and the latter takes out a policy of insurance on the life of his debtor, while he is entitled to fix the amount at one thousand dollars and the interest thereon and the cost of paying the premium and keeping up such insurance, yet from the nature of things it is impossible for the parties to agree on an exact amount which will represent these items. The insurer may have to pay premiums for a quarter of a century; he may not pay but one premium. The interest may run on the principal indebtedness for a year; it may run for twenty years. So that it is practically impossible to settle in advance on an amount which represents the principal and interest of the indebtedness and the cost of the insurance which will be due at the time of the death of the assured. It must be remembered that a contract of insurance must specify a given amount; must be made anterior to death; and being so, the amount necessarily has to be fixed at a time when the pecuniary interest of the creditor in the life of his debtor can not be ascertained. At the same time, in order to render the contract valid it must not be a wagering policy. Therefore a contract is valid and not subject to be attacked as a wagering policy, if the creditor insures for such a sum as, under all the circumstances—considering the amount of the debt, the expectancy of the debtor, the cost per annum of the insurance,—in good faith and by the exercise of reasonable judgment, is estimated to cover the debt and the outlay. If it should so happen that by reason of the early death of the debtor the creditor receives a sum which actually exceeds the amount of the debt and expenses, that sum belongs to him, and if not disproportionate originally, taking the debt as a basis, it is not a wagering contract, and the insurer would be held to perform it. I make no attempt to collect authorities which support this proposition. They are very numerous, and are to be found in all books on insurance which treat the subject.

A distinction must be drawn between a contract of insurance

on his own life, made by one who is indebted to another, and who transfers the policy to his creditor for the security of his debt, and a contract which is made directly by the creditor with the insurer to insure the life of his debtor. In the first instance the contracting parties are the person whose life is insured and the insurer. In that case the creditor has no rights except such as may be given to him by the assignment of the policy. The object of the transfer is to secure the payment of the debt due the creditor. The assignment accomplishes nothing else; and if by any means the debt be paid prior to the decease of the debtor, the assignment has no force or effect, and the original contract is in force, and the beneficiaries named in the contract will take the proceeds of the policy. But where a creditor contracts directly with the insurance company for a policy on the life of his debtor, neither the debtor nor his representatives will at any time thereafter have any interest in that contract, nor under any circumstances would either of them be entitled to the proceeds of such contract, because the contractual relations exist between the creditor and the insurer independent of the debtor. In this case the Equitable company issued a policy payable to the representatives of Hudgins, and the contract entered into and upon which the money in question was collected was that on the death of Hudgins the company agreed to pay to his representatives the amount named in the policy. The policy under the usual rules was assignable. Hudgins, according to the testimony, declined to enter into this contract, but the Exchange Bank, which was the creditor of Hudgins, agreed that it would pay the premiums if it could have the benefits. To this Hudgins agreed, and transferred the policy. As a creditor, while the bank had a right to make a direct contract with the company to insure the life of Hudgins, it did not do so, but it received the policy, which was payable to the representatives of Hudgins, by assignment. Under the law the bank was not entitled to receive out of the assigned policy more than the amount of its debt and the expenses of keeping up the insurance. This being the limited right of the creditor, when, after the death of Hudgins, the money was paid to it as the holder of the policy, what direction

should be given to the remainder of the fund? The answer is had by reference to the original contract. That contract was an agreement to pay to the representative of Hudgins. It can make no difference who paid the premiums, except as to determine what amount the creditor should receive. That a creditor paid the premium did not affect the contract. That contract required the company to pay the amount of the policy to the representative of Hudgins, and by a legal assignment the company was directed to pay to the bank the amount of the policy. Under the law the only amount that the bank was entitled to retain when it so collected the sum agreed to be paid, was its debt, interest, and the expense of maintaining the insurance; and by virtue of the terms of the contract the balance which remained after such payment must go to the representative of Hudgins's estate.

As stated, I have not attempted to collect the numerous authorities which support the propositions here laid down, but have contented myself in giving the line of reasoning which brings me to the conclusion at which a majority of the court has arrived; and, differing as to the reasoning of the case, I concur in the judgment.