1. The plaintiff prayed for cancellation of an assignment of a life-insurance policy, and recovery of the policy itself, on the ground that the policy had been assigned to the defendant "as collateral" in a partnership between them, and that, the partnership having *Page 246 
been terminated and settled, the defendant no longer has an insurable interest in the plaintiff's life. The defendant alleged and contended that the plaintiff was merely an employee, and that the policy was assigned in lieu of a surety bond for the purpose of assuring the defendant that all money collected and handled by the plaintiff for him would be properly paid over, and that this had not been done. Held, that the evidence authorized a finding for the defendant and against the plaintiff on the issue as to partnership. Code, §§ 75-101, 75-102; Dawson National Bank v. Ward, 120 Ga. 861
(48 S.E. 313); Smith v. Hancock, 163 Ga. 222 (2) (136 S.E. 52); Corbin v. Collum, 173 Ga. 681
(160 S.E. 771).
2. The evidence also authorized findings to the effect that the life-insurance policy was assigned to the defendant as security for money of the defendant that would be collected and handled by the plaintiff as an employee, and that the plaintiff was still indebted to the defendant for money which had thus been collected and handled by him. In such case, the assignment would be sufficiently supported by the relation of debtor and creditor, and would not be affected by termination of the employment; nor would it be material whether the defendant otherwise had an insurable interest in the life of the insured. Exchange Bank of Macon v. Loh, 104 Ga. 446
(31 S.E. 459, 44 L.R.A. 372); Morris v. Georgia Loan, Savings Banking Co., 109 Ga. 12 (34 S.E. 378, 46 L.R.A. 506); Rylander v. Allen, 125 Ga. 206 (53 S.E. 1032, 6 L.R.A. (N.S.) 128, 5 Ann. Cas. 355). The case differs on its facts from Turner v. Davidson, 183 Ga. 404
(188 S.E. 828), and 188 Ga. 736 (4 S.E.2d 814, 125 A.L.R. 401), in which the claim of the employer depended on the bare relationship of employer and employee.
3. Even though the plaintiff may not have been indebted to the defendant at the time the policy was assigned, the assignment would cover future indebtedness if so intended by the parties; and the jury were authorized to find that such was the intention. In such circumstances, the plaintiff would not be entitled to cancellation of the assignment on the ground that the indebtedness itself had finally become barred by the statute of limitations. Compare Kirkpatrick v. Faw, 182 Ga. 25 (184 S.E. 855); Sammons v. Nabers, 186 Ga. 161
(4), 163 (197 S.E. 284); Duggar v. Quarterman, 191 Ga. 314
(4), 318 (12 S.E.2d 302); Holt v. Tate, 193 Ga. 256
(3) (18 S.E.2d 12).
4. The evidence did not show that the assignment of the policy constituted a wagering contract, as contended. Bray v. Malcolm, 194 Ga. 593 (2) (22 S.E.2d 126); Chapman v. Lipscomb-Ellis Co., 194 Ga. 640 (22 S.E.2d 393).
5. Under the ruling stated above, there was no merit in the exception to the charge of the court. The evidence authorized the verdict for the defendant, and the court did not err in overruling the plaintiff's motion for a new trial.
Judgment affirmed. All the Justices concur.
 No. 14329. JANUARY 12, 1943.
The exception is to the overruling of the plaintiff's motion for a new trial, after verdict and judgment for the defendant. *Page 247 
On September 15, 1941, Roy S. Lanier filed a suit in equity against L. J. Shuman, praying cancellation of an assignment of a life-insurance policy and recovery of the policy, which had been delivered to the defendant. The petition alleged, that in 1930 the parties entered into a partnership for the purpose of conducting a plumbing and electrical business, under the firm name of Bulloch Plumbing and Electric Company; that the agreement was contained in a written contract, a copy of which was attached to the petition; that the defendant invested in the business about $2300 in cash, and petitioner was to put into the business his skill and labor, and to manage it; that shortly after the partnership was formed, petitioner took out a life-insurance policy for the sum of $2000 which he "assigned to the defendant as collateral in the partnership;" that the partnership was dissolved by mutual consent in 1933, and that the assignment of the insurance policy, now having served its purpose, should be canceled and the policy delivered to the plaintiff. The defendant filed an answer in which he denied the plaintiff's allegations as to partnership. He averred on the contrary that he was the owner of the business, and merely employed the plaintiff to operate it. He further alleged that the policy was assigned by the plaintiff in lieu of a surety bond for the purpose of assuring the defendant that all money collected and handled by the plaintiff would be properly paid over to the defendant, and that during his employment the plaintiff "embezzled" from the defendant various sums of money, amounting to more than the insurance.
The written agreement, in which Shuman was named as party of the first part and Lanier was named as party of the second part, stipulated that the defendant, Shuman, had put into the business $3018.65, consisting of property listed and valued, and a stated amount in cash, and provided further:
"That the title and ownership of the property set forth in summary of inventory is vested in party of the first part; that any losses to said business are to be borne by party of the first part; that said inventory is set forth as a basis of computing net profits in the future, if any, as a mode of ascertaining the compensation to be received by party of the second part, if the half of the net profits exceed weekly allowance given party of second party by virtue of this instrument. That hereinafter party of the second part *Page 248 
agrees to devote his entire time, attention, and labor to the aforesaid business, for which services party of the first part agrees to pay party of the second part one half of the net proceeds or profits, after paying all expenses, bills, and contracts, if said half of profits exceed the weekly allowance of party of the second part as herein provided, which sum said party of the second part hereby agrees to accept in full and complete compensation for his labors, to be computed from the present inventory summary herein set forth. That said party of the first part will have the right to specify from time to time what, if any, sums party of the second part may advance to him regularly on the prospective net profits (his half), which is to be in the nature of advances and to be accounted for out of the net yearly earnings of the party of the second part; provided the half of the net earnings equal or exceed the amount of advances thus given. Otherwise said advances will be in full and complete settlement for the labors of the party of the second part; said advances to be $25 per week until changed by written notice by party of the second part, two weeks in advance. That on or about the first day of January of each year hereafter the parties hereto will make a full and complete accounting for the purpose of ascertaining yearly earnings of parties hereto. . . This agreement is to continue from year to year until and when either party hereto shall give to the party of the other part his intention to quit said agreement of employment, in writing, two weeks in advance; and upon the happening of said event by either party, the parties here agree to cause an inventory and accounting to be had as of the date of the termination, in order that the compensation of the party of the second part may be ascertained and determined as hereinbefore agreed. That as part of his labors the party of the second part agrees to keep or have kept an accurate set of books, preserve and keep all bills, notes, contracts, etc., belonging to said party of the first part, in such a manner as to always be accessible to said party of the first part." Other portions of the contract need not be stated.
The contract was introduced in evidence, and had upon it an entry signed by the parties: "This contract terminated this Feby. 10, 1933." The plaintiff introduced in evidence a writing which he had signed and delivered to the defendant on February 9, 1933, being as follows: "I have this day accepted the following proposition *Page 249 
from L. J. Shuman in re: for the Bulloch Plumbing and Electric Co. My grocery bill at L. J. Shuman's store to date, five ($5) dollars in cash and twenty ($20) dollars in trade for groceries."
The plaintiff in his testimony referred to his relationship as that of a partner, although he further testified, "I did not have a dollar in the business." He admitted that he had "collected money and didn't give credit on the books as [he] should have, numbers of times," but contended that he had not misappropriated any of the money so collected, denying that he "misused a penny." Regarding the circumstances under which the relation was terminated, he testified as follows: "As to how this partnership dissolved, Mr. Shuman came to my house, and I think Mr. Sol Allen was with him, I know it was him, and said he was dissatisfied at the way I was handling the business and was there to buy me out, and he made me the offer. There was nothing said about me buying it, as I remember. He came after the business. He got it. As to what he paid me for it, I don't think I can remember the exact amount now, but there was a grocery bill involved. That grocery bill was around $50 or more, I don't remember exactly. There was $5 cash involved. He gave me $5 in cash. He gave me credit in his store for groceries in the amount of $20, I think. I was paid around $75 for my interest in the plumbing and electric business, something like that. This sale of my interest was supposed to be full and complete between us. I had no further interest in the business whatever. At the time he bought me out he did not say a word about me being short or the accounts being irregular. There was a witness there at the time he bought me out — Mr. Sol Allen. After I sold out to Mr. Shuman and recovered, he employed me to work for him again, to look after the shop. As to how long I worked for him this last time, as an employee, I think it was a week or ten days, something like that. I was finally discharged by Mr. Shuman. As to whether or not I ever heard of any shortage of the accounts until after this suit was filed, I never did. Nobody ever mentioned anything about it. The bookkeeper should be able to know if there was any shortage or any irregularities in the books. . . All of these transactions occurred during the year 1930 and two or three years thereafter." *Page 250 
The defendant Shuman testified that he owned the business, and merely employed the plaintiff to operate it, and that there was no partnership. Concerning the insurance, he testified: "There was a life-insurance policy taken out on Mr. Lanier's life, as a bond, as security, to trust him with my money in the place. . . As to whether or not I asked Mr. Roy Lanier for a bond, yes, sir. He could not furnish a surety bond. The life-insurance policy was taken out to act in place of a bond in case he embezzled money from me. I was to recover out of that bond when and if he did. I have maintained the premiums on that bond throughout these years, and am still paying them."
As to termination of the agreement the defendant testified as follows: "As to what I gave Mr. Lanier, the $5 in cash, his grocery bill, and $20 in trade for, Mr. Lanier claimed I owed him for three weeks work at $25 a week and he owed me $47.98 for groceries, and he told me to give him a credit slip for $20 worth of groceries and $5 in cash, and that would put him paid in full, and he would get out. I owed him for three weeks work, and that is all I owed him for. I was not giving him anything for any interest he had in the Bulloch Plumbing and Electric Company. That was salary, and that was all. . . As to whether or not that settlement I had with Mr. Lanier on the night that I paid him $5 in cash and gave him credit on his grocery bill and a credit slip for $20 was intended as a settlement for all accounts between us, including shortages, or not, no, sir, that was just paying him off for his labor in the place, $75, he claimed I owed him for three weeks work. As to why I owed him for any labor if he owed me money he had taken, that is what he claimed I owed him for his labor. As to whether or not I said anything to Mr. Lanier about the indebtedness at the time the final agreement was signed, sure, I said all along. I don't remember whether I said anything the night the agreement was drawn up or not. . . I had been talking to him all along about the money he had been taking from the business. Mr. Roy Lanier did not have any property to sue him for in order to get a judgment. I had a life-insurance policy to act for that very same thing."
There was evidence in support of the defendant's allegations as to indebtedness by the plaintiff for moneys collected and unaccounted for, in a total sum exceeding the face amount of the policy. *Page 251 
Other testimony was given by each of the parties, and other witnesses were introduced; but the foregoing is deemed a sufficient statement to illustrate the questions raised. There was no objection to evidence.
The jury returned a verdict in favor of the defendant. A motion for new trial was overruled, and the plaintiff excepted. The motion consisted of the general grounds and of two special grounds, the first of which was a mere amplification of the general grounds. The second complained of the following charge to the jury: "If, on the contrary, you find the contentions of Mr. Shuman are correct, that Mr. Lanier embezzled large sums of money from him, which were not covered by the agreement, that the defendant did not intend the agreement had that night to be a complete settlement for such sums of money, if any, that were collected and not returned to the business; if you believe that to be the truth, then the policy would still be good for such sums of money as were wrongfully withheld from the business and should still be held by Mr. Shuman for the purpose of indemnifying him against the loss." The movant averred that "said charge was erroneous and not sound as an abstract principle of law, because it was intended to make disposition of a wagering contract of assignment; an assignment the basis of which is barred by the statute of limitations."