## MORRIS, administrator, *v.* GEORGIA LOAN, SAVINGS AND BANKING COMPANY *et al.*

1. A creditor of a person having his life insured, who takes an assignment of the policy to secure his debt, is only entitled to retain after collection of the policy such an amount as is sufficient to pay the debt together with all advances the creditor has made to keep the policy in force. If a balance remains, the payees named in the policy are entitled to receive it. Accordingly, where the amount of the debt is in issue, it must be ascertained, like any other question of fact, by the verdict of a jury.

2. Where an individual has an interest in a promissory note which he knows was given without consideration, and such individual as cashier of a bank, having full authority and control of the discounts of the bank without reference to or consultation with any other officer of the bank, discounts such note with the funds of the bank, the latter is not a bona fide purchaser of the note, without notice. If it ratifies the act of its officer and claims title to the note, it must take it subject to the knowledge which the officer who discounted it had at the time.

3. It was error to have granted a nonsuit in this case, there being evidence from which the jury might have found a verdict for the plaintiff.

Argued May 25, — Decided October 25, 1899.

Complaint. Before Judge Reid. City court of Atlanta. January term, 1899.

*Anderson, Felder & Davis* and *Arnold & Arnold*, for plaintiff.
*Dorsey, Brewster & Howell*, for defendants.

LITTLE, J. Morris, as administrator of Ragland, instituted an action against Cassin, Purtell, and the Georgia Loan, Sav-

ings and Banking Company, a corporation doing business in the city of Atlanta, to recover the sum of $4,556.31, with interest, which he claims the defendants to be due to him under the following alleged facts: In May, 1895, Ragland procured from the Connecticut Mutual Life Insurance Company a policy of insurance upon his own life, for the sum of five thousand dollars, on which the annual premium was $103.15; the premiums were payable quarterly, and Ragland paid such premiums as were due on May 27 and August 27, 1895. Being unable to continue the payment of the premiums, Cassin and Purtell agreed to advance to him the amounts necessary to pay the same as they became due, and, to secure payment of the amount so advanced, Ragland assigned the policy to Cassin and Purtell, who required and received of Ragland his promissory note dated December 11, 1895, for $4,300 principal, to become due one year after date. This pretended debt was fictitious except as to the premiums advanced by Cassin and Purtell. At the time of these transactions Cassin was the cashier of the defendant banking company. After the execution of the note, Cassin and Purtell indorsed it in blank and made a pretended transfer of it to the defendant banking company, which took the same with notice of its character. On November 5, 1896, Cassin and Purtell also transferred the policy of insurance to the banking company. A short time thereafter Ragland died. Cassin, as cashier of the banking company, made out and forwarded proofs of death, and on the 31st day of December, 1896, the insurance company paid to the banking company the face value of the policy, five thousand dollars, which was consented to by the plaintiff under notice that he as administrator would claim from the banking company the amount so paid, less what had been advanced to Ragland by Cassin and Purtell. Of the five thousand dollars the banking company retained $4,663.11, and $309.89 was received by Ragland's administrator. By the terms of the policy the amount insured was payable to the representatives of Ragland, and the only claim that Cassin and Purtell and the banking company have on the fund is the amount of one premium, $106. No services were rendered, accepted, or con-

tracted for from Cassin, Purtell, or the banking company. Defendants answered, admitting certain allegations, and denying others which raised an issue as to the good faith of the defendants in taking the note and assignment of the policy. It was also admitted that Cassin was cashier of the defendant banking company. On the trial the policy of insurance was introduced in evidence, being for the sum of five thousand dollars, dated May 27, 1895, providing for an annual premium of $103.15, insuring the life of Hudson E. Ragland, and payable to his executors, administrators, or assigns, and containing other stipulations not necessary to be enumerated. To this policy were attached certain assignments, one from H. E. Ragland to H. A. Cassin and J. H. Purtell, dated December 11, 1895, consideration five dollars; the second, by Cassin and Purtell to the banking company, reciting a consideration of $4,609.60. Certain letters were also introduced, written by the insurance company to Cassin in 1896, acknowledging the receipt from the latter of two payments of $26.55 for premiums on the policy of insurance, and of copy of assignment of the policy, and later of the receipt of the policy with releases duly executed.

The oral testimony was, briefly stated, as follows: Mr. Felder, one of the counsel for the plaintiff in error, testified, that he knew Ragland, who was stenographer for the witness's firm. Ragland died about December, 1896. He received from $25 to $30 per month for his services as a stenographer; he was very poor, and witness never saw any signs of his having any large amount of money at any time; he had no visible property up to the date of his death. There was no evidence of his having any more money than what he received from his salary. Witness's firm had an office in the building known as "Temple Court"; the defendant banking company, Cassin, and Purtell were just across the street. Purtell had an office which was either connected with some company that Cassin was following, or in the back room of the bank building. Cassin had an office designated by the sign "Cashier," the bank business being immediately in rear of it. "I went over to see Cassin to talk with him about this matter of insurance; I knew him

very well. Purtell was present on one occasion. We had pre-
pared the petition in this suit. I said to Cassin that I sup-
posed he did not desire the petition filed, that as a matter of
course he did not let Ragland have the money, and I did not
think he could insist on keeping it. I told him he was not
entitled to anything more out of the policy than he put into it.
He said he thought he was, that he was entitled to it without
reference to the amount of money he put in the policy, and
said he was going to contend for it, or words to that effect. I
said, 'Cassin, you didn't put into this policy any more money
than the premiums advanced.' He said either he or Purtell
or both had given Ragland something additional, $25 or $30
above the premium. I told him that if he could stand the
suit we could, and that I would file the petition. He then
asked me to wait until the next day, so that he could see a
lawyer and get advice as to whether or not they could hold the
money. I did not call again, but was sent for, and Cassin
said that he had discussed the matter with Purtell, and they
had been advised that they had a right, without reference to the
amount of money advanced to Ragland, to keep the whole pro-
ceeds of the policy. He did not mention paying anything except
the premium and a small amount of $25 or $30. I told him that
any claim that he let Ragland have any money was absurd,
and he admitted it. The conversation occurred in the office
of the Georgia Loan, Savings & Banking Company. No one else
was present, and no one higher in authority than Cassin. Cas-
sin represented the bank, was acting as cashier." Witness fur-
ther stated that the occasion of his visit was to see both Cassin
and the bank; his understanding was that Cassin was the bank;
had been there several times, and had never seen any one else
doing anything. "Cassin or Purtell told me they had trans-
ferred the policy to the bank for a valuable consideration. The
conversation was after the death of Ragland, and the money
had been collected. Ragland was not a robust, vigorous man;
he was a very small, delicate young man."

Herrington. testified, that he was security on the bond of
Morris as administrator; he went to the bank at different times
with and also without Morris; whenever he went there Cassin

represented the bank; no one else acted on behalf of the bank in paying the money, or claimed to be interested for the bank, except Cassin; no one seemed to be over him or to have charge of him on the subject. "When I went there Cassin said he would pay the difference between the note and the policy, and that was all he would do. I enquired of him about the note and how he came to obtain it, and he gave me to understand that I need not pry into his business. I asked him how the boy [Ragland] came to give him the note; he said, 'The note will speak for itself.' That was in the place of business of the bank." Moyers testified: Knew Cassin and had some knowledge of the Georgia Loan, Savings & Banking Co., and some dealings with it. "Since I have known the company Cassin was in charge of it so far as I could see and know; have known it for 8 or 9 years. They were originally in an upstairs room at the corner of Alabama and Whitehall; Cassin was in charge. They then removed to the corner of Loyd and Alabama; Cassin still had charge, so far as I know. From there they moved to 24 South Pryor. My office was in the adjoining building. I saw that place of business repeatedly during the day, and, so far as I could know, see, and judge, Cassin was in charge of it then. I did not know of any one else having active control of affairs; had many business dealings with the bank; Cassin acted in its behalf, and I recall no transaction I ever had with it that he did not immediately act. Knew some of the directors; knew Grant who was president when I first got acquainted with the institution, also knew Gress by sight. I do not mean to say that Cassin was the owner of the bank, but the Big Boss, so far as his conduct was concerned." Smith testified: Was related to Ragland by marriage; he died about September, 1896, had no property and no means and no income, except his salary as stenographer, that witness knew. Gress testified: He was president of the Georgia Loan, Savings & Banking Company in 1895 and 1896; Cassin was the cashier. Witness took no part with Cassin and Purtell in getting the note and insurance policy from Ragland; had nothing to do with discounting the note; was out of the city; knew the paper was in there, but didn't know whose it was; he found it

afterwards in the assets of the bank before it was due. We had papers on a large number of borrowers; didn't know anything about the people.

This evidence being submitted, defendants moved for a nonsuit. The plaintiff then offered to amend his petition by averring that the note of $4,300 was given by Ragland for an advance of $106, and that $4,194 of the sum was usury, and that the bank is affected with notice thereof. The amendment was objected to, disallowed by the court, and a judgment was then rendered granting a nonsuit in the case, to which the plaintiff excepted. An exception is also taken to the refusal of the court to require the defendant banking company to produce its books under a subpœna duces tecum.

1. It is insisted on the part of the plaintiff that there was evidence before the court which would have authorized the jury to find that, having made a valid contract of insurance on his life, payable to his executors, administrators, and assigns, Ragland was induced by the two defendants Cassin and Purtell to transfer and assign the policy to them for a consideration of $25 or $30 in addition to the payment of certain subsequent premiums as they fell due, and that the note of $4,300 delivered by Ragland to the assignees was really without any consideration and made as a cover to conceal the nakedness of the transfer. An examination of the evidence contained in the record shows that the policy was issued to Ragland on May 27, 1895, and that the assignment of the policy to Cassin and Purtell was made on December 11, 1895, more than six months thereafter. It does not appear that Cassin paid any premiums until May subsequent to the assignment, and for aught that appears in the record the policy evidences a good and valid contract insuring the life of Ragland. If it be true that there was no consideration for the note of $4,300, and that the same was executed and delivered by Ragland only for the purpose of enabling the assignees to claim the entire amount of the policy, it must fail to accomplish that result; for as a matter of law an assignment of a policy of life-insurance to a creditor by the insured, and for the purpose of securing his indebtedness, is valid only in the amount of the debt and the expenses incurred by the cred-

itor in keeping up the policy.    In 2 May on Insurance, § 459 A, it is said, "A creditor's claim upon the proceeds of insurance intended to secure the debt should go no further than indemnity, and all beyond the debt, premiums, and expenses should go to the debtor and his representatives, or remain with the company, according as the insurance is upon life or on property." And in 13 Am. & Eng. Enc. L. (1st ed.), 648, it is declared, on the authority of adjudicated cases cited, that, "Where the assignment is for the purpose of securing a creditor, although he is entitled to recover the face of the policy, he can not hold what is not necessary for his indemnity.    The legal representatives of the debtor will be entitled to the balance."    A case which seems directly in point is that of Cammack *v.* Lewis, 82 U. S. 643, where it appeared that L. was indebted to C. in the sum of $70, and at C.'s suggestion L. took out a policy on his life for $3,000, for which C. paid the premium.    Immediately after the policy was issued, L. gave to C. a note for $3,000, and assigned to him the policy of insurance.    A short time thereafter L. died, and the widow filed a bill to recover the amount of the policy (or rather such a part of it as she had not theretofore received).    In delivering the opinion of the court, Mr. Justice Miller said: "We think that Cammack could, in equity and good conscience, only hold the policy as security for what Lewis owed him when it was assigned, and such advances as he might afterwards make on account of it, and that the assignment of the policy to him was only valid to that extent."    See also the case of *Exchange Bank of Macon* v. *Loh,* 104 *Ga.* 446, where this court held that a creditor has, for the purpose of indemnifying himself against loss and for no other, an insurable interest in the life of his debtor, and that the insurance will be available to the creditor to no greater extent than the amount of his insurable interest at the time the insurance was effected, viz., the amount of the then existing indebtedness.    So that, if it be true that at the time he executed and delivered the promissory note for $4,300 and assigned the policy of insurance to Cassin and Purtell, Ragland was in fact a debtor to the assignees in an amount less than the face of the policy, the effect of the assignment was

to vest in the assignees title to so much of the fund collected as equalled the amount of the true indebtedness. The original contract of insurance made the executors and administrators of Ragland, as well as his assigns, the payees of the policy after payment of the debt his assignment secured. The administrator would in law be entitled to have the balance. But it is urged that, even if the note was without consideration, the inference is legally irresistible that the purpose of the parties in the execution of the note and the assignment of the policy of insurance was an accommodation. How this is we, of course, do not know. Only a jury under proper instructions should determine that fact.

2. It is further insisted by counsel for defendants, that the evidence showed that the banking company was a bona fide holder of the note and transferee of the policy of insurance, for value, before due, and that this fact precludes a recovery by the administrator. A bona fide holder of a negotiable promissory note receiving the same before due, for value, is protected against a plea of failure of consideration. But the subject-matter of the present action is to recover from the defendants a sum of money which it is alleged they collected and which belongs to the plaintiff. The collection of the money and its retention by the defendants can not be based on the fact that they are innocent holders of a promissory note of the insured received before due, for value; the money for which suit was brought did not come into the hands of the defendants as the proceeds of any negotiable instrument; and their right to collect the policy and to hold the amount as payment of the note depends upon the assignment of the policy, and not upon the manner in which they hold the note. A policy of insurance is a contract which is not negotiable, but is assignable, and the law which protects the bona fide holder of a negotiable promissory note, when received before due and for value, in no sense applies to the transfer or assignment of a contract of insurance. Unless the assignor has a right or interest in the contract which he is capable of assigning, the assignee takes nothing by the assignment, and that he has such right and interest the assignee must determine at his peril. "A policy of insurance

is assignable as well absolutely as by way of mortgage or pledge to secure a debt." It is a "chose in action, governed by the same principles applicable to other agreements involving pecuniary obligations." Bliss on Life Insurance, § 328. Being a chose in action, a contract of this character may be assigned so as to vest the title in the assignee, but the latter takes it subject to the equities existing between the assignor and debtor at the time of the assignment. Civil Code, § 3077. However, we are not disposed to omit from our consideration the important legal question on which the parties are at issue, and which must ultimately control the disposition of the fund arising from the collection of the policy of insurance. It is contended by counsel for the plaintiff, if the note given by Ragland was without consideration and received by the payees as a cover under which they might hold the policy by transfer, that the knowledge of Cassin, one of the payees, of the character of the note must be imputed to the bank of which he was cashier. This contention is denied by counsel for the defendants, who insist that even if the theory of the plaintiff be correct as to the origin of this note and the scheme which Cassin is charged with having engineered, then the bank is not chargeable with any notice or knowledge of Cassin; and that if it discounted the note before due and for a valuable consideration, the law will not impute to it the knowledge of Cassin.

Assuming, for the sake of the argument, that the note at its execution was without consideration, invalid, and part of a scheme to defraud, it becomes important to ascertain what business relation Cassin, one of the payees, bore to the banking company, and in what manner the note was negotiated. One of the witnesses testified that he had known the banking company for eight or nine years; that Cassin was apparently in charge of affairs; that witness knew of no one else having active control of affairs besides Cassin; that witness had a great many business dealings with the bank; that Cassin acted for the bank whenever such dealings were had, and he does not recall any transaction ever had with the bank where Cassin did not act. The president of the bank testified that he knew nothing about any of the notes or any of the parties to any of

the bank notes, and had nothing to do with the discounting of them; he was out of the city when Ragland's note was discounted; he afterwards found it in the assets of the bank. For aught that appears in the record, no other officer of the bank ever knew of or had anything to do with the note of Ragland and the policy of insurance until after the former was discounted and the latter transferred. Therefore, what was done for the bank was done by Cassin without consultation. And just here we may call attention to the difference which existed in the manner of conducting the business of this banking company and that of ordinary banks of discount. Usually, in the latter, the question of discounting paper comes before the board of directors or a committee, and the cashier is but the executive officer to carry out their decision; his duties are ordinarily strictly executive. It is, however, nevertheless true that, beyond his inherent powers, the cashier may be authorized to act for the bank by the organic law, by action of the stockholders, by a vote of the board, by usage and tacit approval. 1 Morse on Banks and Banking, § 165. If it be assumed in this case that the duties inherent in the office of cashier do not fix the status of Cassin as such officer of the bank for the discounting of commercial paper as would make the bank chargeable with a notice to him, the evidence fully warrants the conclusion that he in fact, by permission of those interested in the bank, did exercise those duties, and that no one else did. Our Civil Code, § 3027, declares that notice to the agent of any matter connected with his agency is notice to the principal; and, under this established rule of law, it is insisted that when Cassin represented the bank and discounted the note of Ragland payable to himself and Purtell, he did it as the agent of the bank and with full knowledge at that time that it was entirely without consideration, and that therefore the bank is not a bona fide holder without notice. While conceding the general rule, counsel for the defendants insist that it is qualified by a well-recognized exception, and that the true rule is clearly set out in the opinion in the case of Benedict v. Arnoux, 154 N. Y. 715, as follows: "So long as the agent acts within the scope of his employment, in good faith,

for the interest of his principal, he is presumed to have disclosed to his principal all the facts that come to his knowledge; but just as soon as the agent forms the purpose of dealing with his principal's property for his own benefit and advantage, or for the benefit or advantage of other persons who are opposed in interest, he ceases in fact to be an agent acting in good faith for the interest of his principal, and such purpose is deemed to be in fraud on the rights of his principal, and the presumption that he discloses all facts that have come to his knowledge no longer prevails."

We are not prepared to admit that, where the agent has notice, the doctrine of implied notice to the principal rests alone on the presumption that the agent will disclose his knowledge to his principal. Many adjudicated cases place it there; others do not; and we shall take occasion presently to cite some of the latter, and present some of the reasons why the Arnoux case, supra, falls short of settling the rule applicable to the case at bar. We may say here, that we find it impracticable to review in detail the many interesting and pertinent cases cited by counsel for defendants. Necessarily, in stating the reasons which impel our conclusions, we, to some extent at least, discuss the principles which they enunciate. Taking the rule of constructive notice as stated in our code to be fully established, and considering in connection therewith the exceptions to this general rule urged by counsel, we call attention to the view of Judge Story as expressed in his work on Agency, § 140. He says: "Notice of facts to an agent is constructive notice thereof to the principal himself, where it arises from, or is at the time connected with, the subject-matter of his agency; for, upon general principles of public policy, it is presumed that the agent has communicated such facts to the principal; and if he has not, still, the principal having entrusted the agent with the particular business, the other party has a right to deem his acts and knowledge obligatory upon the principal; otherwise, the neglect of the agent, whether designed or undesigned, might operate most injuriously to the rights and interests of such party." In discussing the duty of the agent to communicate the knowledge which he has to the principal, Mr. Wade,

in his treatise on the Law of Notice, § 690, says: "The restriction of the rule to cases where there is a probability that the agent will communicate the knowledge seems to have had its origin in a total misapprehension of the purposes for which the rule was established. It tends to defeat the application of the doctrine to cases where it is most essential in the promotion of good faith and fair dealing;" and cites the following case as an example: A solicitor acted for both parties in preparing a deed which contained a covenant against prior incumbrances. The same solicitor had previously prepared a mortgage on the identical property. The court held that the fact that the solicitor was employed by the party whose interest it was to conceal the prior mortgage was sufficient evidence that it was concealed from the principal, and he was therefore unaffected by the knowledge of his agent. Further referring to this case, the author says: " Leaving out of consideration the probable event of its being utterly impossible for the agent to communicate the knowledge in time, the case cited above fairly illustrates the danger of resting the rule upon the presumption that the agent communicates the knowledge of which he is possessed, unless such presumption is conclusive. The doctrine announced in this case is against the weight of authority, both in England and in this country." Again, this author in § 683b declares, upon authority, that "A corporation will always be affected when the notice comes to it through an officer within whose special line of duty the matter in question lies," and that "The cashier of a bank is the particular officer who has charge of the ordinary business of the bank, and for this reason notice of facts affecting its business will bind the corporation." In treating of the effect of notice to directors and other officers of a corporation, the same author in section 683a declares: " And where he [the officer] acts for the corporation in the transaction of the business in respect to which it is sought to charge it with notice; as where he, as one of the board of directors, authorizes the discount of a note procured by fraud, of which he had notice, the bank would be bound as though his knowledge had been communicated to the entire board. When the fact in question comes to the knowledge of a

director or other officer when he is making authorized official inquiry, or is otherwise engaged officially for his principal, it can be of no consequence that he fails to communicate it"; citing 121 Mass. 490; 2 Hill, 454; 25 Conn. 446; 34 N. Y. 30; 27 N. H. 157. Mr. Pomeroy (2 Equity Jur. § 666), after declaring that the rule which we are considering alike includes and applies to the positive information or knowledge obtained or possessed by the agent in the transaction and to actual or constructive notice communicated to him therein, says: "The *rationale* of the rule has been differently stated by different judges; by some it has been rested entirely upon the presumption of an actual communication between the agent and his principal; by others, upon the legal conception that for many purposes the agent and principal are regarded as one."

We admit the existence of many adjudicated cases which seemingly support the contention of the defendants as to the exception to the general rule under which they claim that the banking company is entitled to hold the note of Ragland, freed from any implied notice of Cassin's fraud, if such there be. But a distinction must be drawn in these cases between the exception and the rule. We concede it to be a sound proposition that where an officer or agent of the corporation, as a party in interest for himself, deals with the corporation, the latter is not charged with notice of the information possessed by such officer or agent so dealing, but it is because in such a transaction the assumed agent is in realty the adverse party and is not to be treated in so dealing as an agent of the corporation at all. And many, if not a majority, of the cases which announce the doctrine that when the agent has an interest in the transaction which would be prejudiced by the disclosure of the information, the presumption of its communication does not prevail, will be found to be where the agent or officer acts in his individual capacity and treats with some other officer or agent of the corporation. In these cases the two parties to the contract are the corporation and the individual who happens to be an officer of the corporation but acting in the prosecution in his individual capacity. But the principle involved in those cases can not be fully applicable to a case where one party,

having knowledge of the invalidity of a paper of which he is the ostensible owner, discounts it in a bank of which he is the duly authorized agent, and is himself the only actor for the bank and by his act enables the bank to collect and retain the proceeds of such paper against the rights of the true owner. In such a transaction he is either the agent of the bank to discount the paper, or he is not. If he is not, then the discounting was illegal, and the owner is entitled to it or its proceeds. If he is the agent of the bank and the facts insisted on here existed, his action would be a fraud upon the rights of the owner, of which the bank can not take advantage. In the case of First National Bank *v.* New Milford, 36 Conn. 93, it appeared that Conklin was at the same time treasurer of the town and cashier of the bank; that he took $3,000 from the bank for his own use and executed a note to it for the amount as treasurer of the town, he having been allowed and accustomed to make loans for the bank without consulting the directors. The money he received was put to his personal use; none of the officials of the town knew of the existence of the note until afterwards when the defalcations of Conklin became public. At the date of the note the town was not in need of money. On the question of the knowledge of the bank, the court in that case said: "If Conklin, as agent of the town, had applied to the directors for a loan, offering the note and telling them that he had drawn it, not for the benefit of the town, but for his own benefit, without consulting the officers of the town, and when there was a sufficient supply of money in the treasury, it must be conceded that the board would in making the loan have been *particeps criminis* in the fraud, and the bank could not recover. . . We can not perceive that that case would differ from this. The contract, if any was made, was made by Conklin on behalf of the bank. No other mind but his met the mind of the agent of the town in making the contract. He as agent of the bank had full knowledge, therefore, of the fraud; and now the bank, if they ratify his contract and confirm his agency, must accept his knowledge and be bound by it, precisely as if the loan had been made and the knowledge had by the board of directors."

The Supreme Court of New Hampshire has ruled, that if one without authority assume to act as the agent of another, and the latter take the benefit of the unauthorized act by claiming rights under it, or otherwise ratifying the acts of his self-appointed agent, he must take such benefit with notice of such matters as appear to have been within the knowledge and recollection of the agent at the time of the transaction. 13 N. H. 145. And it seems to be established that where one is an officer of two corporations which have business transactions with each other, his knowledge can not be attributed to either corporation in a matter in which he did not represent it. If he did represent one or both, his action would be binding and his knowledge would attach to the one represented. Smith *v.* Farrell, 66 Mo. App. 14; 118 Ill. 625; 47 N. W. Rep. 402; 2 Hill, 451; 72 N. Y. 286; 11 S. C. 396. In a case reported in 134 Mass. 453, it appeared that B. as trustee held certain trust funds; that as an individual he owned a bank. F. was the cashier of the bank and was also agent of B. F. as agent was in possession of certain moneys belonging to B.'s trust fund, and wrongfully paid the same in discharge of a private indebtedness which B. owed the bank, either to himself as cashier or to the teller. On a bill filed by the cestui que trust the court ruled, that the bank must restore the money; that F.'s knowledge was the knowledge of the bank; that the bank could not receive the trust funds except charged with the knowledge that the cashier had, and subject to the responsibilities which that involved; and said: "If F. was the instrument of B. in committing a fraud on the bank by unlawfully transferring to it the securities of another, whether he concealed this fact or not, the bank could not take the securities from his hands or hold them in its custody except with the knowledge he had. The only authority the bank could have to hold or sell them was under the contract made by or through Fuller, its cashier." In the case of Davis Co. *v.* Davis Co., 20 Fed. Rep. 699, where the transaction was had between one, who was an officer, with other agents of the corporation, two propositions are discussed and decided which refer to the distinction above suggested. The first is, that "A corporation is charged with notice of facts known to a director who is an active agent of the corporation in the

transaction affected by his knowledge, although he acquired his knowledge unofficially." The second is, that "A corporation is not charged with notice of facts known to its officer or agent in a transaction between him and the corporation in which he is acting for himself and not for the corporation." In the case of *Brobston* v. *Penniman*, 97 *Ga.* 527, it appeared that three persons formed a partnership. Two of the three were, respectively, president and cashier of a bank. The two persons holding said offices, without the knowledge of the third, executed and delivered to the bank in which they were officers a promissory note in the name of the partnership, to raise a sum of money which they had agreed to put in the partnership business. It was held that the knowledge of the president and cashier of the facts mentioned was the knowledge of the bank itself, and that the bank was not entitled to recover against the partnership. See also 72 N. Y. 286; 19 Hun, 354. It was held In re Millward-Cliff Cracker Co., 28 Atl. Rep. 1072, that "the fraud of a bank president in contriving and negotiating in his bank fraudulent notes of a corporation, for his own use, imputes knowledge to the bank, and it has no claim against the corporation."

3. It is our opinion that, under the evidence submitted, a jury would have been authorized to find that the insurance policy was a good and valid contract; that the execution of the promissory note and the transfer of the policy of insurance by Ragland to Cassin and Purtell were without consideration and in fraud of the payees of the policy, the executors and administrators of Ragland, and that the defendant banking company took the note and the transfer of the policy of insurance with the knowledge of Cassin that the same was fraudulent and without consideration. We do not, of course, mean to be understood as intimating that these facts are conclusively established by the evidence, but only that a jury could under the evidence have found them to be true, and if they had the plaintiff in the action would have been entitled to recover. The court having granted a nonsuit, thereby refusing to permit the jury to render a verdict under the evidence in the case, committed error, and the judgment is

*Reversed. All the Justices concurring.*