**MAYS et al. v. FIRST STATE BANK OF KELLER.   (No. 336-3703.)**

(Commission of Appeals of Texas, Section B. Feb. 14, 1923.)

1. **Corporations** ☞428(10)—**As respects imputation of knowledge of agent to corporation, agent's adverse interest is immaterial if agent is sole representative of corporation.**

In cases where an officer or agent of a corporation is the sole representative of the corporation in a transaction where he also acts for himself or for a third person, the knowledge of the officer or agent of the facts of the transaction is imputed to the corporation, irrespective of his adverse interest.

2. **Banks and banking** ☞116(6)—**Notice to cashier acting for self in taking notes held imputable to bank where cashier solely in charge.**

Where cashier was the sole representative of his bank in taking notes to make good the amount of his misappropriation of the bank's funds, his knowledge of the fact that the payee and indorser had intrusted such notes to him for the purpose of securing a loan from a third party to such payee and indorser was imputable to the bank, notwithstanding the cashier's adverse interest.

Error to Court of Civil Appeals of Second Supreme Judicial District.

Suit by the First State Bank of Keller against W. J. Mays and another. Judgment for plaintiff was affirmed by the Court of Civil Appeals (233 S. W. 326), and defendants bring error. Reversed and rendered.

John L. Poulter, of Fort Worth, for plaintiffs in error.

Samuels & Brown, of Fort Worth, for defendant in error.

HAMILTON, J. The statement of the case and findings of fact made by the Court of Civil Appeals follow:

"In its final form this suit is one by the appellee, First State Bank of Keller, against W. J. Mays and Charles Mays upon two series of promissory notes. The first series consisted of six, payable in the sum of $100 to W. J. Mays, or order, and given by Riley and Sarah Gonzales, as purchase money for a certain tract of land conveyed by W. J. Mays to them. These notes were dated August 3, 1914, and the first one made to mature July 7, 1915, and the others yearly thereafter. The second series consisted of two, each payable to W. J. Mays, or order, in the sum of $550, and executed by one J. W. Price as part of the purchase money of certain lots owned by W. J. Mays and conveyed to Price on the date of the notes, which was October 26, 1914. These notes matured July 1 and December 1, 1915, respectively.

"Gonzales and wife and J. W. Price were made parties defendants and the plaintiffs

sought, as against them and W. J. Mays, judgment with a foreclosure of the vendor's liens evidenced by the notes. The claim of Charles Mays originated after the claim of the plaintiff bank, and is wholly dependent upon the defense presented by the defendant W. J. Mays, and in our subsequent treatment of the case we will therefore make no further reference to Charles Mays.

"There is but little, if any, controversy in the facts. Briefly stated, in September and October, 1914, the cashier of the plaintiff bank, one John Thomson Adams, appropriated certain moneys to his own use and thereby became indebted to the plaintiff bank in the sum of $1,700. This defalcation having been discovered, the said cashier, on the 27th day of October, 1914, brought to and had entered upon the bank's books the promissory notes hereinabove described, in liquidation of his said indebtedness. The evidence shows that the bank officers and others, from time to time, passed upon and treated said notes as the property of the bank and as an extinguishment of the cashier's indebtedness, and the jury, in answer to a special verdict, so found. It is also undisputed that at the time of such deposit each of said notes was indorsed by W. J. Mays. It is also undisputed that at the time of such deposit of the notes and acceptance thereof by the plaintiff bank no officer other than said cashier had notice or knowledge of any defense to said notes, or of a vice or imperfection therein.

"It further appears, however, both from the evidence, and from a special finding of the jury, that at the time of the delivery of the notes in question by J. Thomson Adams it was understood and agreed between them that said notes should be put up as collateral by the said Adams only to obtain a loan from R. G. Johnson, and that said notes should be used in no other way and for no other purpose; the testimony on the subject by W. J. Mays being to the effect that Adams, in whom he had confidence, approached him with the representation that he was about to lose a section of land in West Texas that he had purchased, for the want of $1,700, and that to enable Adams to save his land he (Mays) had given the notes in question to him (Adams) with the directions to take them to Mr. R. G. Johnson and use them as collateral security for a loan."

The trial court rendered judgment in favor of the plaintiff against the makers and J. W. Mays, as indorsers, for the amount due on the notes, and foreclosing the vendor's lien. Defendant Mays alone appealed, and the Court of Civil Appeals affirmed the judgment. 233 S. W. 326.

Concerning the power and functions of Adams, Mr. Bass, the only man working in the bank at the time the matters in this suit occurred, and cashier of the plaintiff bank at the time of the trial, testified:

"I knew John Thomson Adams very well. He was cashier of the Bank of Keller, and as such he made the loans and would pass upon all loans that were made. He did all the loaning and directing the work in the bank; for instance, myself, I was at his command, and

☞For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

he assumed all of the responsibility and made all the loans, since the president was not active."

The evidence shows, without contradiction, that—

"No director or any one interested in the bank had anything to do with taking the notes into the bank, except Adams."

[1] It is a well-settled general rule of law that so long as the agent acts within the scope of his employment, in good faith, for the interest of his principal, he is presumed to have disclosed to his principal all the facts that come to his knowledge. The exception to this rule, that when the agent deals with his principal's property for his own benefit and advantage, or for the benefit or advantage of other persons who are opposed in interest to his principal, or where his own interests in the acts performed by him are adverse to the interests of his principal, the presumption that he discloses all facts that have come to his knowledge no longer prevails, is equally well settled. But there is a qualification of the foregoing exception which brings within the general rule, which charges the principal with knowledge possessed by the agent, those cases in which the officer or agent, though he act for himself or for a third person, is the sole representative of a corporation in the transaction in question. The ground of imputed knowledge is that when a principal has consummated a transaction, in whole or in part, through an agent, it is contrary to equity and good conscience that he should be permitted to avail himself of the benefits of the agent's participation without becoming responsible as well for his agent's knowledge as for his agent's acts. Irvine v. Grady, 85 Tex. 120, 19 S. W. 1028. Some of the cases hold that the rule rests upon the principle of the legal identity of the principal and agent.

When the officer transacts business *with* the corporation instead of *for* it, he is supposed to treat with it at arms' length, and not to disclose facts against his own interest. Wade on the Law of Legal Notice, § 683b. But a different status is created where the officer deals both *with* and *for* the corporation; where he as an individual deals *with* himself as agent for the corporation and as agent deals *for* the corporation, *with* himself as an individual, in one and the same transaction. In such a case we cannot conceive otherwise than that he as agent knows everything that he as an individual knows. He as an individual is present in person, and the corporation is present in him as its agent and representative. Everything known to him in his individual capacity concerning the transaction is known to him in his capacity as agent and representative of the corporation. When he assumes the duties of agent and representative of the corporation, in that transaction, there passes with him into that capacity all that he knew of the transaction in his private individual capacity. Where he is the sole representative of the corporation in the transaction, under such circumstances, the corporation is as wise as the customer or client. He is the corporation and he is the customer or client. The result, so far as notice is concerned, is not more favorable to the corporation than if the officer dealt with another officer or the board of directors of the corporation in the transaction first communicating to the other officer or board everything the first knew about it. In such case the corporation would be charged with the facts—yes, would know the facts—and the corporation would not be permitted, in equity and good conscience, to avail itself of the agent's participation in the transaction without becoming responsible for his knowledge. Neither should the corporation be permitted, in equity and good conscience, to avail itself of the acts of its officer in dealing with himself without being held to possess all the knowledge concerning that transaction that he possessed at the time thereof.

[2] In this case, Adams obtained the notes and made the agreement as to the purpose and manner of their use while he was cashier of the bank, but not while engaged in the duties of that office. When he re-entered the bank and assumed those duties, he became the representative of the bank. He had charge of the bank and of all employees thereof. He was the bank's head and brain. As such officer and head of the bank, he, of course, knew all the details involved in the procurement of the notes from Mays and all the conditions and limitations imposed upon him by Mays as to the use and disposition of those notes. The bank was as wise as Adams was wise concerning the notes. Under this state of facts, Adams as the agent and representative of the bank received from Adams as an individual the Mays notes and as such representative of the bank applied them to the liquidation of his obligation to the bank created by his embezzlement. To hold that the bank, under these circumstances, is entitled to the benefits of its agent's acts without responsibility for his knowledge, would open the way for injustice and wrong by the agents and officers of banks and other corporations against the public. The officer is either the agent of the bank, in such a case, or he is not its agent. If he is not its agent, then the bank is not entitled to the results of his acts; if he is its agent, it is charged with all the knowledge he had concerning the transaction. If Adams was not the agent of the bank in this case, then the notes would have no status in the bank's possession different from that which would have been created had they been stealthily placed in its possession by some person entirely disconnected with the bank. In such a case who could say that the bank had title to them by

virtue of the deficit in its funds created by Adam's embezzlement?

The qualification of the exception to the rule that a principal is chargeable with the knowledge of its agent acquired in executing the agency and is subject to the liabilities which such knowledge imposes, to the effect that the exception does not apply when the officer of the corporation, though he acts for himself or a third person, is also the sole representative of the corporation in the transaction, is supported by the highest authority. We admit that there are a number of cases holding otherwise, but the number and reasoning of the cases supporting the qualification preponderate.

In the case of First National Bank of New Milford v. Town of New Milford, 36 Conn. 93, Conklin was both treasurer of the town and cashier of the bank. He took $3,000 from the bank for his own use, and executed a note, as treasurer of the town, payable to the bank for that amount. He was accustomed to make loans for the bank without consulting the directors. None of the officials of the town knew of the existence of the note until the default of Conklin became public. Conklin used the $3,000 himself. At the date of the note the town did not need money. On the question of the knowledge of the bank the court said:

"If Conklin, as agent of the town, had applied to the directors for a loan, offering the note and telling them that he had drawn it, not for the benefit of the town, but for his own benefit, without consulting the officers of the town, and when there was a sufficient supply of money in the treasury, it must be conceded that the board would in making the loan have been particeps criminis in the fraud, and the bank could not recover. * * * We cannot perceive that that case would differ from this. The contract, if any was made, was made by Conklin on behalf of the bank. No other mind but his met the mind of the agent of the town in making the contract. He as agent of the bank had full knowledge therefore of the fraud; and now the bank, if they ratify his contract and confirm his agency, must accept his knowledge and be bound by it, precisely as if the loan had been made and the knowledge had by the board of directors."

The Supreme Court of New Hampshire has ruled that if one without authority assume to act as the agent of another, and the latter take the benefit of the unauthorized act by claiming rights under it, or otherwise ratifying the acts of his self-appointed agent, he must take such benefit with notice of such matters as appear to have been within the knowledge and recollection of the agent at the time of the transaction. Hovey v. Blanchard, 13 N. H. 145. And it seems to be established that, where one is an officer of two corporations which have business transactions with each other, his knowledge cannot be attributed to either corporation in a matter in which he did not represent it. If he did represent one or both, his action would be binding, and his knowledge would attach to the one represented. Smith v. Farrell, 66 Mo. App. 14. See, also, Bank v. Dunbar, 118 Ill. 625, 9 N. E. 186; Farmers' & Traders' Bank v. Kimball Milling Co., 1 S. D. 388, 47 N. W. 402, 36 Am. St. Rep. 739; Bank v. Davis, 2 Hill (N. Y.) 451; Holden v. Bank, 72 N. Y. 286; Webb v. Manufacturing Co., 11 S. C. 396, 32 Am. Rep. 479.

Without further reviewing the cases supporting the qualification to the exception on the above ground, we content ourselves by citing the following cases, in support of that qualification: Black Hills National Bank v. Kellogg, 4 S. D. 312, 56 N. W. 1071; Morris v. Georgia Loan, Savings & Banking Co., 109 Ga. 12, 34 S. E. 378, 46 L. R. A. 506; English-American Loan & Trust Co. v. Hiers, 112 Ga. 823, 38 S. E. 103; National Bank v. Feeney, 9 S. D. 550, 70 N. W. 874, 46 L. R. A. 732; Stonecutter Co. v. Myers, 64 Mo. App. 527; Commercial Bank v. Burgwyn, 110 N. C. 267, 14 S. E. 623, 17 L. R. A. 326; Brobston v. Penniman, 97 Ga. 527, 25 S. E. 350.

There is another line of cases which explicitly puts the decision, in such cases, upon the ground that a party, even though innocent, cannot avail himself of an advantage obtained by fraud of another, unless there is some consideration moving from himself. Such was the holding in Atlantic Cotton Mills v. Indian Orchard Mills, 147 Mass. 268, 17 N. E. 496, 9 Am. St. Rep. 698. It was held in that case, by virtue of that principle, that where the common treasurer of two corporations, in order to make good his deficit to one, had drawn checks upon the other, payable to the order of the first, by which the money was drawn and used, no other officer of either knowing the facts, the corporation using the money was affected with the treasurer's knowledge, and the transaction did not amount to a payment of the deficit. In the course of the opinion in that case the court said:

"The ground on which the plaintiff asserts a right to retain the money is, that Gray had embezzled its funds, as well as the funds of the defendant, to a large amount, and that it is entitled to apply the money thus received from him to reduce his indebtedness for such embezzlements, and treat the same as a payment pro tanto; that from the nature of the transaction the law stamps it as a payment; and that thus the plaintiff is a holder of the funds for a valuable consideration. There is no doubt that a thief may use stolen money, or stolen negotiable securities before their maturity, to pay his debts, and in such case an innocent creditor may retain the payment. But this doctrine is inapplicable to the present case, for two reasons. In the first place, under the circumstances disclosed in the auditor's report, the plaintiff cannot be considered as an innocent creditor, that is, a creditor without notice; and, moreover, the transaction did not amount to a payment. It is true, that no officer of the plaintiff besides Gray knew of the

fraudulent origin of these checks; but in the very transaction of receiving them, the plaintiff was represented by Gray, and by him alone, and is bound by his knowledge. It is the same as if the plaintiff's directors had received the checks knowing what he knew. For the purpose of accepting the checks, Gray stood in the place of the plaintiff, and was the plaintiff. It is quite immaterial, in reference to this question, in what manner or by what officers of the corporation the funds were afterwards used. The important consideration is, how the plaintiff became possessed of the money; and it is apparent that it was through the act of no other person than of Gray himself. It is not as if Gray had stolen the money, and then called the directors of the plaintiff corporation together and informed them of his indebtedness, and of his desire to make a payment on account, and had then paid over to them the money as money coming from himself, and they had received it without knowledge or suspicion that it had been stolen, and given him credit for it as part payment. There was no transaction whatever between Gray and the plaintiff, in respect to the transfer of this money, in which the plaintiff was represented either in whole or in part by any other person than by Gray; and therefore, even though the transfer to the plaintiff had been made in bank bills or in gold coin (which it was not), the plaintiff must be deemed to have had knowledge of the true ownership, because in receiving the funds it acted solely through Gray's agency. It must be deemed to have known what he knew, and it cannot retain the benefit of his act, without accepting the consequences of his knowledge. The plaintiff cannot obtain greater rights from his act than if it did the thing itself, knowing what he knew. Such is the doctrine either expressly declared or necessarily involved in numerous adjudged cases. * * *

"The effect of knowledge is to put the plaintiff in the same position that it would be in if there were no pretense of a consideration moving from it. In order to entitle it to retain the defendant's funds, both elements must exist—a good consideration, and the want of knowledge that the funds belonged to the defendant. Such want of knowledge cannot, in the view of the law exist, where the party in the particular transaction is represented solely by one who has knowledge. The rule is general, that, if one assumes to do an act which will be for the benefit of another, commits a fraud in so doing, and the person to whose benefit the fraud will inure seeks, after knowledge of the fraud, to avail himself of that act, and to retain the benefit of it, he must be held to adopt the whole act, fraud and all, and to be chargeable with the knowledge of it, so far at least as relates to his right to retain the benefit so secured."

To the same effect are First National Bank v. Dunbar, 118 Ill. 625, 9 N. E. 186; Holden v. New York & E. Bank, 72 N. Y. 286; Commercial Bank v. Tatum, 193 Ala. 120, 69 South. 508; Pensacola Bank v. Thornberry, 226 Fed. 611, 141 C. C. A. 367; Ditty v. Dominion National Bank, 75 Fed. 769, 22 C. C. A. 376; Skud v. Tillinghast, 195 Fed. 1, 115 C. C. A. 83.

We hold that the bank had knowledge through Adams, its cashier and manager, of the purpose, and the only purpose, for which it was agreed between him and Mays the notes should be used; that in seeking to avail itself of the wrongful disposition of the notes and to retain the benefit from them, the bank adopted that wrongful and fraudulent disposition of them and is chargeable with the knowledge of it to the extent that such knowledge forbids it the right to retain the benefit of the notes.

We recommend that the judgments of the trial court and the Court of Civil Appeals be reversed, and that judgment be rendered that defendant in error take nothing by this suit, and that it pay all costs incurred by reason thereof.

CURETON, C. J. Judgments of the Court of Civil Appeals and district court both reversed, and judgment rendered that defendant in error take nothing by its suit.