**CONNECTICUT FIRE INS. CO. v. COMMERCIAL NAT. BANK OF SAN ANTONIO.**

No. 8047.

Circuit Court of Appeals, Fifth Circuit.

Feb. 10, 1937.

Rehearing Denied March 5, 1937.

Maurice E. Purnell, of Dallas, Tex., for appellant.

M. J. Arnold and Harold K. Stanard, both of San Antonio, Tex., for appellee.

Before SIBLEY and HOLMES, Circuit Judges, and STRUM, District Judge.

SIBLEY, Circuit Judge.

The plaintiff-appellant, Connecticut Fire Insurance Company, sued Commercial National Bank of San Antonio for three $5,000 Liberty bonds which had been stolen from the mails in Chicago and which by subrogation and assignment had become the property of the insurer who is suing. They were, of course, negotiable and unmatured, and value was paid by the Bank. Its defense of bona fide holder for value without notice was sustained by direction of the verdict. The questions were and are whether the Bank's title is affected by the bad faith of its president who bought the bonds for it, and if so whether the evidence reasonably supports the theory that he knew or believed the bonds to be stolen and was in a conspiracy to share the proceeds with the thieves.

To defeat title to such bonds for which value is paid it is necessary to prove not merely that the buyer had some suspicion or was negligent in not investigating, but in view of his knowledge and the circumstances there must have been bad faith. Murray v. Lardner, 2 Wall. 110, 17 L.Ed. 857; Fidelity Trust Co. v. Mayhugh (C.C.A.) 268 F. 712. A corporation as an artificial being can have good or bad faith only as those who act for it have the same. Probably the knowledge or intention of the governing officers may affect the transaction of some other agent who is acting in good faith, but no such situation is presented here, for the bad faith of the president alone is in question and he alone negotiated the bond purchase. The general rule that the principal is bound by the knowledge of his agent is recognized, but in the bank's behalf the well-established· exception is urged that when the agent who has knowledge is acting in his own interest and adversely to or in fraud of the principal, so that disclosure would defeat his purposes,

the law will not presume disclosure and will not impute the knowledge to the otherwise innocent principal, whether the principal be an individual or a corporation. American National Bank v. Miller, 229 U.S. 517, 33 S.Ct. 883, 57 L.Ed. 1310; American Surety Co. v. Pauly, 170 U.S. 133, 134, 18 S.Ct. 552, 42 L.Ed. 977; Levy & Cohn Mule Co. v. Kauffman (C.C.A.) 114 F. 170; Union Central Life Ins. Co. v. Robinson (C.C.A.) 148 F. 358, 8 L.R.A.(N.S.) 883. But this exception is not by the weight of authority to be extended to cases where the principal in the questioned transaction acted wholly through the double-dealing agent and claims a benefit thereunder against another innocent victim of the agent's conduct. The rule then to be applied is that the principal cannot take the benefit of his agent's act without taking also the burdens resulting from the agent's knowledge and intentions. Curtis, Collins & Holbrook Co. v. United States, 262 U.S. 215, 43 S.Ct. 570, 67 L.Ed. 956; Bosworth v. Maryland Casualty Co. (C.C.A.) 74 F.(2d) 519; Ditty v. Dominion Nat. Bank (C.C.A.) 75 F. 769; Kean v. National City Bank (C.C.A.) 294 F. 214; Mays v. First State Bank (Tex.Com.App.) 247 S.W. 845; Morris v. Georgia Loan, etc., Co., 109 Ga. 12, 34 S.E. 378, 46 L.R.A. 506. The transaction of the unfaithful agent may indeed be not binding on his principal in the sense that because of fraud the principal can repudiate or rescind it, but if he elects to retain its specific results to the detriment of a third person justice requires that he take the transaction with its actual infirmities. It is argued that this principle ought to apply only when the recreant agent is his principal's alter ego or engaged with him in a joint enterprise, relying on some expressions in Curtis, Collins & Holbrook Co. v. United States, and Bosworth v. Maryland Casualty Co., supra, and Federal Land Value Ins. Co. v. Taylor (C.C.A.) 56 F.(2d) 351; Anderson v. Missouri State Life Ins. Co. (C.C.A.) 69 F.(2d) 794. Such relationships may present clear cases, but at last there is no difference between a general or sole agent and a special agent except in the scope of their respective authorities. When authority to do the act is present, every agent fully represents his principal in that act. And when the act is done by an agent of any class and advantage is claimed under it there can be no question of the authority to do it. If other agents have participated in good faith the act may be attributed to them, ex-

cluding the activity of the false agent, but this cannot be done where the transaction is solely the latter's. In the present controversy the Bank is not repudiating the president's purchase of the bonds and seeking to recover its money, but is claiming the bonds to which it can have no right except through his purchase. True the directors, the president being one, two months previously had decided to buy United States bonds in order to qualify the Bank as a depository of postal savings, and had authorized either the president, the vice president, or the cashier to make purchases, but none of these had anything to do with the purchase of these particular bonds except the president. A teller furnished the cash to pay for them but did not pay it to the seller, but at the president's request handed the president the money without knowing, so far as appears, what was to be done with it. His act was ministerial. He exercised no judgment about buying the bonds and took no part in the negotiations. The bonds, after the transaction was completed, were returned through his cage to the auditor and to·the bookkeeper for proper entries directed by the president, but the auditor and bookkeeper also acted only clerically. The president, alone in his compartment with the seller, negotiated for and decided on the purchase of the bonds and consummated it by receiving the bonds and delivering the money. He was the sole actor through whom the Bank acquired the bonds. It is bound as against their innocent owner by his knowledge and intent.

■ On the question of the president, Bonner's, good faith there was evidence enough to make a jury issue. Bonner gave the sole direct testimony as to the transaction, which occurred on February 27, 1933, and testified as to his innocence and good faith. But he stated that the seller was a self-introduced stranger named Whitfield, whose initials and address he did not ask, and though in great trouble about these bonds and others since he has never sought to locate this stranger. The seller accepted Bonner's first offer for the bonds, which was slightly below par and did not include anything for the interest coupons due only six weeks later. Cash was requested in payment, but this awakened no suspicion, since every one was trying to get and hoard gold and currency. The banks all over the country were failing because of cash withdrawals, and his bank had lost by withdrawal a million dollars of its deposits. On cross-examination he stated that about February 21, 1933, another stranger named Morrow was introduced to him by the Bank's attorney, Cunningham. Morrow had a $100,000 Liberty Loan bond to sell, but it appeared unusual in color and paper and he had showed it to the cashier, who also thought it looked strange and proposed that it be taken to the local branch of the Federal Reserve Bank to ascertain its genuineness. Morrow was for doing this, but they did not go. Though the Bank itself held as collateral other bonds of that issue but of smaller denomination, Bonner sent to St. Louis and bought a bond of $1,000 for comparison, and when Morrow came back on March 1st he and the cashier had decided that Morrow's bond was genuine. On ·March 1st Morrow brought five of the $100,000 bonds for sale and Bonner agreed to buy them all but to take delivery of only one per day, as the Bank did not have enough ready cash, which was demanded for them. So delivery was taken of only one, and a messenger was sent to the Federal Reserve Bank for $50 and $100 bills since large denominations were asked for. Immediately afterwards Bonner cashed without charge the December 15, 1932, interest coupon which Morrow had retained, nearly $1,500. On the same day Bonner bought from another stranger for cash $26,900 of bonds since sued for as stolen. On March 2d, by proclamation of the Governor of Texas, the banks were closed, and the President's Bank Holiday of March 4th followed. This bank reopened on March 14th on a restricted basis, and failed July 29, 1933. Nevertheless Bonner testified that on March 20, 21, 22, and 23 Morrow returned and received for his other bonds cash in $50, $100, and some $1,000 bills gotten specially on each day from the Federal Reserve Bank, and that each day the purchased bond was sent to the Federal Reserve Bank as collateral for a loan to replenish the bank's cash. ˙ He says he had no suspicion until he was indicted about these bonds in Chicago in the summer. His story is corroborated ˙by the records of the Bank and of the Federal Reserve Bank and the testimony of the cashier and tellers except, of course, as to Bonner's knowledge and intentions. As to these his account does not hang together perfectly. The authorized purpose of buying bonds was to pledge them with the United States Treasurer to secure postal deposits, but these large bonds were at once used to get

cash to buy themselves with, and one was used permanently to secure a public deposit. The $15,000 of bonds sued for Bonner says were callable in 1933, and were later so called, and were not desirable for postal savings but were used from the first as security elsewhere. Considering the plight for cash that this and all other banks were in in late February and March to meet the demands of their depositors, it seems strange that Bonner would put out so much cash to enable strangers to hoard it, as he supposed, nor is it very reasonable that he should think that one man would wish to exchange honest interest-bearing government bonds at a price below par for noninterest bearing currency backed by the same government to an amount of a half-million dollars. No other purchases of bonds for cash were known to the other officers. The lawyer Cunningham, who is charged to be a coconspirator, Bonner mentions as present only at the introduction of Morrow on February 21. The cashier puts him present at three transactions. Bonner on February 21st wrote the Treasury Department thus: "Today after buying a Government bond of the issue 46–49 we noticed that it was of a different looking paper from all paper that we had theretofore handled in that the very distinct line of silk threads did not run through the paper. We rushed over to the Federal Reserve Bank to ask their opinion. They compared it with other bonds that they had and pronounced it a genuine bond, etc." He did not deny that the letter referred to Morrow's bond, and made no explanation of its glaring untruths. He testifies that he bought all five of Morrow's bonds on March 1st, delivery only being postponed, but the bank's records show that he paid a price of 97 $14\!\!/\!_{32}$ for the one then delivered but only 92.50 for the others.

There is other evidence to connect Bonner, Cunningham, and one Royster with each other and with a plan to buy stolen bonds, and with a sharing of the profits. Royster testified by deposition, vaguely, unwillingly, unsatisfactorily. He was injured in an airplane wreck in August, 1933, and had been in the hospital ever since. His manner of testifying may be due to untruthfulness, or to his state of health, or to his unwillingness to implicate himself. He swears in effect that Cunningham late in 1932 and early in 1933 had him looking up government bonds that could be bought at 65, and took him once to Chicago where

Royster thought some cheap bonds were for sale. Royster went once or twice with Cunningham to see Bonner about them, and Royster asked Bonner what he would do if the bonds were stolen and he answered that title passed with the bonds, that government bonds were like paper money; and referred to a law book in his office. Royster met Morrow in New Orleans and sent him to San Antonio. Morrow returned, but Cunningham wrote Royster to get Morrow back, that they were ready to do business; that there had been some talk whether Morrow's $100,000 bond was counterfeit but it was found all right. Royster said his best recollection was that once when Cunningham took him to see Bonner the discussion was that they had purchased the bonds at 65 cents on the dollar. He is somewhat corroborated by letters which he had from Cunningham. In October Cunningham writes that he is very hard up and about to be sued on several notes, and urges Royster to hurry up and do something. In November he writes that he hopes to make the deal but sees no sense in going about it in so roundabout a way. "We have always been ready to pay on delivery here. I do not see how we could transfer funds to pay anywhere else. I can possibly get a party in St. Louis to handle it. He lives in St. Louis and is a well to do bond dealer. * * * Where would you want Bonner to go to look at the goods?" On December 24th he writes: "I thought before now we would have our business settled. * * * Things are pretty tough with me. I am going to lose everything unless I can make something pretty quick." Additional circumstances were proved as follows: On February 18, 1933, Bonner gave Royster a check on funds of a loan company which he controlled, and whose office was on the mezzanine floor of the bank, which check Bonner had charged to Royster. Royster repaid the loan March 1st. In July all records which had been made of the transaction were found to have been done away with. The canceled check, the bank's statement for the period, the stub from the checkbook, the ledger and cashbook sheet had all disappeared, the bookkeeper knew not when or how. Bonner had access at all times to these records. On February 27th, the date of the purchase of the bonds here sued for, Royster bought a new $1,260 automobile and paid cash for it in $50 and $100 bills, registering the car in the salesman's name. On March 3d he bought a

new airplane and made a down payment of $2,500 in $50 and $100 bills, registering it in the seller's name. The balance of about $4,000 he paid on March 10th in $50 and $100 bills. Cunningham, who wrote he was broke on Christmas Eve, on March 8th paid $3,500 to the Bank on a note. On March 22d he paid $1,000 to a mortgage company, and on April 1st $3,500 to Bonner's loan company, and in May paid an income tax deficiency for 1931 of $724, and two other debts of $460 and $350. Four of these were by cashier's checks of the defendant bank, bought by his son with $50 bills. Cunningham during this time was shown to have had and used a safety deposit box in the Bank which he sometimes visited in company with Bonner on which he paid no rent, and when requested to register it in his name refused, saying he had arranged for it with Bonner. No other safety deposit box was so handled. Bonner on February 27th paid the Bank a $1,900 debt, his checking account showing that the money was not gotten from it. On March 14th he paid a note of $350 in $50 bills. To another of his institutions he paid $3,000 on March 14th in cash, and on March 24th paid other notes to the amount of $12,500 in $50 and $100 bills, remembered because such large bills were unusual, but gave his check for the interest due on them. No explanation of any of these circumstances was given. Neither Cunningham nor his son testified, though the son was present in court. Without arguing the inferences that could be drawn, we think the issues were for the jury.

Bonner was not a disinterested, unimpeached, reasonable witness who must be believed, such as were involved in Pennsylvania R. Co. v. Chamberlain, 288 U.S. 333, 53 S.Ct. 391, 77 L.Ed. 819. If the charge which he was seeking to rebut be proven true, he would be civilly liable to the Bank and perhaps indictable. He is distinctly interested and biased, and in some respects contradicted by others and himself. His credibility, like Royster's, is for the jury, as is also the meaning and force of the proven circumstances. Gunning v. Cooley, 281 U.S. 90, 50 S.Ct. 231, 74 L.Ed. 720; Sonnentheil v. Christian Moerlein Brewing Co., 172 U.S. 401, 408, 19 S.Ct. 233, 43 L.Ed. 492; Pope v. Beauchamp, 110 Tex. 271, 219 S.W. 447. Many of these circumstances relate more clearly to the purchase of the five $100,000 bonds, but that negotiation began eight days before the bonds here sued for were bought,

and it would not be unreasonable to conclude that all of the bonds were bought in pursuance of a single plan. The judgment is reversed and the case remanded for further proceedings not inconsistent with this opinion.