### FIRST NAT. BANK OF WACO, TEX., v. DORBANDT.*

No. 8482.

Circuit Court of Appeals, Fifth Circuit.

Nov. 29, 1937.

James H. Hart, of Austin, Tex., and E. Y. Boynton and B. R. Sleeper, both of Waco, Tex., for appellant.

Ike D. White, of Austin, Tex., for appellee.

Before SIBLEY, HUTCHESON, and HOLMES, Circuit Judges.

SIBLEY, Circuit Judge.

The appellee Dorbandt is a bankrupt to whose discharge the appellant objected

*Rehearing denied Jan. 13, 1938.

on the ground that credits had been obtained from appellant successively on false written financial statements made on April 15, 1927, October 21, 1927, April 1, 1929, February 15, 1930, April 12, 1931, November 5, 1931, and April 14, 1932. The referee, as special master, made findings of fact which the District Judge approved, and granted the discharge. It was found that each of the statements was false in that the bankrupt represented that he owned a half interest in a ranch of 5,800 acres worth $42,000, the title to which was in his father, and owned other described lands; the truth being that he had only an agreement with his father to graze cattle on one-half the first-named ranch for looking after his father's business on the other half; and that his wife owned the other tracts. It was found that when the first-mentioned statement was used at the bank to procure an individual loan, the bankrupt believed it was true "because his mother had told him that his father had told her that his father was going to give him one-half of the ranch," so that the statement that bankrupt owned half was not willfully false. Before the next statement was made and used at the bank, the bankrupt asked his attorney about signing it, and was advised that he had no present actual interest in the ranch, but that if the bank's president, W. W. Woodson, thoroughly understood that the bankrupt had only a grazing right and that the other lands were his wife's, the bank would be on notice and he might go ahead and sign it. Woodson had in fact prepared the second statement and (though Woodson denied it) the bankrupt had fully explained the truth to him. But Woodson, before preparing it, had along with one Guggenheim formed a parol partnership with the bankrupt to buy and sell cattle. "They were to be equal partners. The bankrupt was to look after the cattle on the 5800 acre ranch. Mr. Guggenheim was to keep the books, and Mr. Woodson was to arrange the necessary finances." The bankrupt's financial statement was made up to aid in the financing and was, with statements of the financial condition of Guggenheim and Woodson, presented to the bank's finance committee which, on hearing the statements read by Woodson, granted the partnership a credit of $25,000, a mortgage to be taken on 200 head of cattle and 2,000 goats which the partners were planning to buy. Bankrupt and Guggenheim also put up some other collateral, and all three partners were required to guarantee the loan. The business was carried on by repayments and new loans under similar statements made from time to time through 1932. Woodson handled the transactions for the bank after the grant of the $25,000 credit, and the master found that the bankrupt thought that he was dealing entirely with Woodson. There is conflict as to whether the bankrupt appeared in person before the finance committee; Woodson, and a member of the committee testifying that he did, and the bankrupt saying that he did not recall it; if he was ever before a finance committee he did not know it. The master did not find on this point. We must hold the weight of the testimony to be that he did appear. The master finds that there was no conspiracy or collusion between bankrupt and Woodson to withhold facts to induce a credit, and no knowledge that Woodson had withheld the full truth from the bank, although the bankrupt knew that the purpose of financial statements was to give the bank information. It was also found by the master that the committee did not, in granting the credits, consider the part of the statement relating to the real estate on the argument that it was disclosed therein that title was in the bankrupt's father; and that Woodson knew at the time that the statements of ownership of real estate were untrue though he did not communicate it to other officers of the bank.

As to the first statement, we find it hard to believe that a man would think he owned a half-interest in a ranch because his mother said his father had said to her he was going to give it. The individual advance then made was repaid out of the $25,000 credit later extended to the firm, and we pass by that statement, assuming its ignorant honesty. When the same assertions of ownership were put by Woodson in the statements to get credit for the partnership and when bankrupt signed them there was no ignorance or oversight, but full knowledge of their falsity. The advice of counsel that they might be signed if Woodson understood their falsity does not prevent their being knowingly false. The master concluded, the judge approving, that since Woodson was an officer of the bank and was acting for it, what he knew the bank knew, though uncommunicated to it and

though Woodson was a partner in the firm applying for credit; citing Goldstein v. Union National Bank, 109 Tex. 555, 213 S.W. 584, and Mays v. First State Bank (Tex.Com.App.) 247 S.W. 845. The doctrine there asserted that where one adversely interested is the sole agent of a bank or other person in a transaction, the principal seeking to enforce the transaction must take it burdened by the knowledge and intentions of the agent who alone created it, was also upheld by this court in Connecticut Fire Ins. Co. v. Commercial Bank, 87 F.2d 968. But it does not apply here for two reasons; one is that the bank is not here enforcing any contract made for it by Woodson; the other is that Woodson did not act for the bank in passing on these statements, but its finance committee did. It may be true, as is argued, that Woodson was then solvent and interested like the bank in the solvency of his partner. But it was Woodson's obligation in the partnership to finance it, and this he was trying to do in presenting these statements to the finance committee, not wishing, if he could, to advance the necessary $25,000 himself. Supposing he knew the misstatements, as is found, he had the same interest to conceal them as if he were borrowing the money for himself, and for that reason his knowledge is not imputable to the bank dealing with him through other officers, according to the cases above cited. But these rules of imputed notice are not the exact point here. The question is whether the bankrupt made to the bank knowingly false statements, and secured credit thereby. We do not see how the question can be answered negatively. He admits the statements were false and he knew it, and hides behind Woodson as being the bank, when he knew well enough that Woodson was his partner seeking credit for the partnership from the bank. We suppose both he and Woodson intended to repay and not to defraud the bank, but they did knowingly obtain credit on false written statements.

Nor can we approve as supported by evidence the conclusion that the finance committee did not grant credit partly on the representations about real estate ownership. They constituted a large part of the written statements. Real estate remains when other things have vanished, and while not favored by banks as a desirable collateral because not liquid, it is a good second reliance. The real estate was considered important enough to be kept in all the statements. The two members of the committee who testified said they relied on it, and did not notice, if Woodson read it, the recital that title to the ranch was in bankrupt's father. That, however, would not exclude an equitable ownership in bankrupt. No one testified the real estate was not considered by the committee as a basis of credit, and we find no evidence that it was not. In the light of all the evidence, we think a discharge must be denied. See In re Monsch (D.C.) 18 F.Supp. 913, and cases cited; Morimura, Arai & Co. v. Taback, 279 U.S. 24, 49 S. Ct. 212, 73 L.Ed. 586 and note.

The judgment is reversed, with direction to deny a discharge.